COURT OF APPEALS OF VIRGINIA

Present: Judges Kelsey, Beales and Senior Judge Clements
Argued at Richmond, Virginia

NISOURCE, INC. AND ACE AMERICAN
  INSURANCE COMPANY
                                                    OPINION BY
v.      Record No. 0423-08-2           JUDGE JEAN HARRISON CLEMENTS
                                                    APRIL 7, 2009
ERIC SHAWN THOMAS


        FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

            Scott C. Ford (Brian A. Richardson; Jessica L. Hacker; McCandlish
            Holton P.C., on briefs), for appellants.

            Wesley G. Marshall for appellee.


        NiSource, Inc. and Ace American Insurance Company (collectively, employer) appeal a

decision of the Workers' Compensation Commission (commission) terminating the outstanding

award of temporary total disability benefits to Eric Shawn Thomas (claimant) and awarding him

temporary partial disability benefits instead. In reaching that decision, the commission

determined that claimant had engaged in post-injury, light-duty work and failed to report

earnings. The commission imputed a post-injury average weekly wage of $320 to claimant and

calculated the amount of temporary partial disability benefits to award him on that basis. On

appeal, employer contends the commission erred in imputing wages of only $320 to claimant.

On cross-appeal, claimant contends the commission erred in finding he had returned to work and

imputing an average weekly wage to him. Claimant also contends the commission abused its

discretion in refusing to assess attorney's fees and costs against employer. Finding no error, we

affirm the judgment of the commission.

I.  BACKGROUND

Claimant sustained injuries to his chest, abdomen, left side, and right shoulder while working as a contract inspector for employer on January 4, 2006.  Employer accepted claimant's injuries as compensable, and the commission entered an award for temporary total disability benefits in the amount of $736 per week, commencing January 12, 2006, and continuing. Claimant did not return to work with employer.

In October 2006, employer discontinued paying temporary total disability benefits to claimant.  On November 8, 2006, following the commission's rejection on technical grounds of its two previous applications, employer filed an application for a hearing alleging that claimant had returned to work on or before July 11, 2006, and had failed to report earnings as required by Code § 65.2-712.[1]  Employer sought termination of the outstanding award and a credit for its overpayment of compensation.  On November 20, 2006, claimant filed a motion for the assessment against employer of his costs and "a ten percent penalty on all compensation unjustly withheld" by employer.  Claimant alleged that employer's application for a hearing was filed "without reasonable grounds and in bad faith."  These matters came before the deputy commissioner for a hearing on May 7, 2007.

At the hearing, claimant defended employer's application on the grounds that he had "not returned to work" and had "earned no wages" and that there was "no medical evidence of a physical capacity to perform sustained employment."  Employer defended claimant's motion for costs and a penalty on the ground that its application was "grounded in fact and law."

Claimant testified at the hearing that he formed Combat Solutions, a law enforcement and military product supply company, on January 10, 2006.  Claimant was the corporation's

---

[1] Code § 65.2-712 provides, in pertinent part, that "an employee [who] . . . receives payment of compensation under this title . . . shall have a duty immediately to disclose to the employer . . . [any] return to employment [or] increase in his earnings."

registered agent and, pursuant to the documents filed with the State Corporation Commission, he and his wife, Michelle Thomas, were the company's only two officers. In February 2006, the company purchased and took over the operation of a business owned by Todd Bahr. Claimant wrote a check to Bahr for $50,000 for the business. On March 19, 2007, claimant and his wife executed paperwork issuing the shares of the company solely to claimant's wife.

Claimant testified that he was identified on the company's website as an "owner/operator" of the company, as a certified National Rifle Association instructor, and as a trainer for QuickClot products, which the company sold. Claimant also testified that, although it was "a false statement," he was identified on the company's website, for marketing purposes, as a former United States Army Ranger.[2]

Claimant further testified that the company had "actively [sold its] product" via a Combat Solutions store on eBay until three months before the hearing. However, the company produced no documentation for those transactions.

Claimant also stated that the company had a "brick and mortar" store in Fredericksburg, Virginia, which was open Monday through Friday from 10:00 a.m. to 6:00 p.m. and on Saturdays from 10:00 a.m. to 4:00 p.m. Claimant admitted he routinely went to the store, but, "never [having] thought about it," could not give an "exact average" of the days per week he had been in the store since January 2006. He testified that "[i]t could [have been] anywhere from one day to four days" per week. When asked if he agreed that he had previously testified in a deposition that he went to the store an average of four days per week since January 2006, claimant stated that he believed he had said "three or four" days, but acknowledged he could not remember exactly what he had said. Claimant later testified that he went to the store "anywhere from two,

---

[2] Claimant explained that he had received some Ranger training while in the Army National Guard and added that "all businesses" used the same "marketing strategy" on their websites.

three, four days" a week and had "probably . . . never been there all six days" during a week. He further testified that he had never "been placed on a regular work schedule there."

Claimant stated that, when he went to the store, he "usually" watched television, played solitaire, or took naps in the store's backroom. When the store was busy, he helped out by answering the phone and working in the store. He worked the front counter, greeted customers, rang up sales, and talked to customers about firearms and ammunition. He testified he worked alone in the store for more than 1 hour approximately 15 to 20 times. He also admitted he wrote 139 checks on behalf of the company from February 2006 to January 2007; worked at a gun show where the company had a booth on August 19, 2006; taught a home firearm safety class at the company's store on August 9, 2006; trained a company employee to teach QuickClot classes and helped him teach a three-hour training session; and alone executed a contract on August 7, 2006, engaging Walter Darrow as the company's accountant. Additionally, claimant acknowledged that he had personal business cards for the company with his name on them and that he drove a vehicle that had a Combat Solutions logo emblazoned on its side.

Claimant denied receiving any payment from Combat Solutions for the work he did for the company. He stated that he received reimbursement from the company for a computer he purchased. He also testified that he had to sell a boat and two motorcycles after his workers' compensation payments stopped. It was his understanding the business lost $27,000 the first year of its operation, but admitted that this understanding of the company's finances was based solely on the profit and loss statement prepared shortly before the hearing by the company's accountant. He testified that his wife handled the company's finances.

Claimant further stated that, in addition to providing training for QuickClot products, the company offered a handgun class every week as well as courses in "home firearm safety" and "personal protection." Claimant testified that, except for the one class he taught on August 9,

2006, when he filled in for Todd Bahr, those classes were taught by Bahr, the person from whom claimant and his wife purchased the business, and Curt Sebastian, the only employee actually on the company's payroll. According to claimant, Bahr taught the handgun class "up until he went to the police academy," and Sebastian taught "the class from that point on."

Claimant further maintained that, after selling the business to claimant and his wife, Bahr continued to work for the company until he left to attend the police academy in late 2006. Claimant testified that Bahr resumed "stopping by and helping out at the shop" after he graduated from the academy. However, he no longer "receiv[ed] monies from the business for services performed" and helped out mostly by fixing and assembling weapons. Between March 3, 2006, and November 15, 2006, the company issued at least 20 checks signed by claimant to Bahr totaling $5,094.

Claimant testified that students normally had to put down an initial $25 deposit when they signed up for the handgun class and then pay an additional $20 when they took the class. Claimant further testified that Combat Solutions paid the instructor of the class $38 per student, which represented the $45 fee charged to the student less the $7 the company paid for the booklet and certificate provided to the student.

Claimant also testified that it was his understanding that every sale the company rang up was accounted for in the company's computer system. However, claimant was unable, looking at the computer printout of the company's sales on August 9, 2006, to identify the sales for the two students who participated in the class claimant taught that day. Likewise, he could point to no other document that showed the company had "a record for receipt of monies from the two students."

Claimant further testified that the company hired Sebastian in August 2006 to work in the store during the week. Usually at the store from 9:30 a.m. to 6:00 p.m., he worked 36 to 38

- 5 -

hours per week. From the end of August to the end of December 2006, he received $5,502 in wages from the company. Sebastian also owned a wildlife removal business and was a volunteer firefighter.

Claimant denied ever having been released to light duty since January 2006 and testified that he did not feel he was "physically capable of performing light duty as a sales clerk." He maintained that he was physically unable to work at all due to the possibility of re-injuring a non-repairable diaphragmatic hernia, which could cause him to be "on a respirator the rest of [his] life." It was his understanding that he had been "deemed nonreturnable to work under life threatening conditions."

Claimant's brother, Chris Thomas, identified himself as a board member of Combat Solutions but admitted he was not listed as such in the company's paperwork. He testified he worked at the company's store on Saturdays from 9:30 a.m. to 4:00 p.m. and used his law enforcement contacts to "bring in new business" for the company. He further testified he did not receive any pay from the company for the work he did. He also stated he had a separate full-time job as a law enforcement recruiter that required him to work at least 40 hours per week and travel. He maintained claimant was not an employee of Combat Solutions but acknowledged he had seen him writing checks for the company and working at the store assisting customers and ringing up sales.

Claimant's wife, Michelle Thomas, testified she worked an average of 30 hours per week at the company's store without pay. She closed the store every night and worked on days she had off from her full-time job as an office manager for a dental office. She testified she had all Fridays and some Wednesday afternoons off from her job at the dental office. She paid the bills and "maintain[ed] the books and records for the business," including the company's QuickBooks Point of Sale records, and provided the company's accounting records to Walter Darrow, the

company's accountant, for preparation of the company's tax returns. She testified the gross receipts for the business from February 13, 2006, through March 19, 2007, totaled $459,873 and the total expenses for the business for calendar year 2006 totaled $80,728. She agreed that the profit and loss statement prepared by the company's accountant on February 28, 2007, showed the company had a net loss of $27,732 in 2006. She further testified all of the sales at the store were rung up and documented on the QuickBooks Point of Sale system used by the company. She stated the company had sold only two products on eBay since January 2006 and the company's sales on eBay had totaled no more than $400. She could not, however, identify those sales in any of the financial records produced by the company. Nor could she identify anywhere in the company's records the payments made by the two students in the August 9, 2006 class taught by claimant. She identified Sebastian as the company's sole payroll employee and indicated he had been paid a total of $5,502 since he started working for the company on or around August 25, 2006. She testified that claimant received no compensation from the company for any of the work he performed and "was not an employee of the company." She further stated that claimant did not do "a whole lot" for the company and went to the store "a few times" a week because he was bored. It was, she explained, simply "a place for him to go." She acknowledged that she had observed him "ringing up sales" and "assist[ing] customers" at the store.

Bernard Trice, a licensed private investigator retained by employer, testified that he observed claimant for several days in July and August 2006. On July 11, he saw claimant arrive at the Combat Solutions store at approximately 9:45 a.m. Inside the store, Trice observed claimant in "an office area behind the front counter." Trice learned that "claimant [taught] firearms classes but a schedule of the classes was not available at [that] time." On the evening of July 13, Trice observed claimant outside the back door of the store demonstrating a rifle to a

customer. According to Trice, claimant appeared to be shooting rubber bullets from the gun. Trice saw claimant leave the store around 7:00 p.m. On July 20, Trice observed claimant arrive at the store at approximately 11:00 a.m. and leave the store around 6:45 p.m. On July 21, Trice called the company's store and was told that the next handgun class would be given on August 2 at 6:00 p.m. Trice was also told that "claimant, as well as his brother [taught] the classes." On August 9, Trice took a home firearm safety class at the store at 6:00 p.m. The class was taught by claimant. According to Trice, he paid claimant $45 in cash shortly before the class began and claimant did not offer him a receipt. He saw claimant put the cash in the drawer of the cash register. Trice also observed the other student pay claimant $45 in cash without receiving a receipt. At the conclusion of the nearly two-hour class, Trice received a certificate signed by claimant. Trice further testified that he never saw claimant have any physical problems during the entire period of observation.

Leslie Robson, a certified public accountant and certified business evaluation analyst, stated that he was hired by employer to review the available records to determine whether claimant worked for Combat Solutions and, if so, the value of claimant's services to the business in terms of an "average weekly wage." He testified that he had examined the financial records produced by the company, the depositions taken by employer, and the private investigator's report.

Referencing the company's February 28, 2007 profit and loss statement listing the total cost of goods sold in 2006 at $269,522 and the total income from the sales of goods sold in 2006 at $302,518, Robson explained that dividing the "cost of sales" by the "reported sales" produced "an unreasonably high percentage for cost of sales" at 89.09%. Robson further explained that the inverse of the cost of sales percentage represented the company's gross profit margin. He testified that a gross profit margin of only 10.91% was "extremely low . . . for this particular

industry." Robson further testified that, pursuant to "industry data," the gross profit margin for a business that was the type and size of Combat Solutions would normally be between 30.34 and 36.10%, meaning the cost of sales percentage would be between 63.90 and 69.66%.[3] Those ranges, Robson stated, would "not change dramatically" even during the business's "startup period." According to Robson, a gross profit margin of 11% was "so far out of range that [it was] . . . beyond the realm of being reasonable." A company simply could not "stay in business very long" at that rate, he explained. Considering the "unreasonably high" cost of sales percentage shown in the company's February 28, 2007 profit and loss statement; the fact that a separate inventory report produced by the company revealed a cost of sales percentage of 67.4%,[4] which was in line with the industry average; and the fact that he found no entry in the company's financial records for the stated income received in connection with the company's eBay sales or the August 9, 2006 class taken by the investigator, Robson opined that the company had substantial unreported income.

Using the cost of sales figure listed in the company's February 28, 2007 profit and loss statement—$269,522—and the cost of sales percentage "at the high end of the industry average"—69.66%—Robson opined the company's actual total income from the sales of goods sold in 2006 was at least $386,911, or $84,393 more than the income reported by the company.

------

[3] Robson testified that these percentages were derived from two "well known source[s]" of average "operating ratios of companies" based on company type and size: "Wiley Value Source," which uses information from the Internal Revenue Service to "compute[] average operating ratios," and "RMA Annual Statement Studies," which uses loan data from banks to compute those ratios. According to Robson, the cost of sales range of 63.90 to 69.66% corresponded to a "gun shop" of the size of Combat Solutions.

[4] The report, entitled "Combat Solutions Inventory Summary," showed that the total extended cost of the inventory the company had on hand was $23,804 and the total extended selling price of that inventory was $35,319. Robson explained that dividing the cost of the inventory by the amount for which it was to be sold resulted in a cost percentage of 67.4%.

Adding the $84,393 of unreported income to the company's net loss of $27,732, Robson concluded the company had a "corrected net income" of approximately $56,660 in 2006.

Robson then apportioned the $56,660 to claimant and his wife and brother, the three "people working in the business who [did not] have direct salaries being paid by check." Based on information contained in the depositions "about how much time each person spent at the business," Robson determined that claimant's wife worked 18.5 hours per week at the company's store on weeknight evenings and Saturdays, claimant's brother worked 11 hours per week mostly on Saturdays, and claimant worked 40 hours per week, for a total of 2,919 hours from March 13, 2006, when the store started generating sales, through December 31, 2006. In attributing 40 hours per week to claimant, Robson noted that, according to the records he reviewed, claimant was the only person who worked at the store during the day on weekdays until Sebastian started working for the company in August. Dividing the company's 2006 "corrected net income" of $56,660 by the 2,919 hours claimant and his wife and brother worked in the business yielded an hourly rate of pay of $19.41. That rate, Robson noted, was less than the $23.50 median hourly rate listed by the United States Bureau of Labor Statistics "for a manager of a retail store of that nature and that size." Multiplying the hourly rate of $19.41 by the 40 hours of work per week attributed to claimant, Robson calculated that the average weekly wage that should be imputed to claimant was $776. He opined that, "in a situation like this," where it is known that an individual is actively working in a family-owned business and there are no "direct and open payments of income to that individual for the work that is done," it is appropriate and necessary to impute value for the work performed. "Real businesses," he stated, "keep records of the hours that their workers work and they pay them with checks and they report all of their sales."

Walter Darrow, a certified public accountant, testified that he had reviewed the accounting records of Combat Solutions and was preparing tax returns for the company. He further testified that his firm prepared the February 28, 2007 profit and loss statement showing the company had a net loss of $27,732 in 2006. He stated that the company's loss was not unexpected since first-year companies often had "some sort of loss." Darrow also testified he had not seen any records of payments by the company to claimant for any work he performed. Likewise, he was unaware of any evidence that the company had underreported its 2006 income by $56,000. He acknowledged that the reports he prepared were "only [as] good as the data" he received from the company.

The relevant medical evidence provided to the deputy commissioner established that claimant was admitted to the hospital on January 4, 2006, following a fall of approximately 25 feet at work. Claimant's attending physician, Bradford F. King, M.D., diagnosed claimant as experiencing "[l]eft chest wall and abdominal wall pain" and ordered, among other things, an MRI and CT scan of claimant's previously repaired diaphragmatic hernia. On January 23, 2006, Dr. King noted that, although the MRI and CT scan showed that claimant's diaphragmatic hernia repair was intact, he did not want claimant to "return to any significant physical activity, work or otherwise[,] that would endanger th[e] diaphragm hernia repair."

On January 30, 2006, Dr. King opined that claimant's condition precluded him from returning to his work as a contract inspector:

> I feel that any re-injury of his diaphragm would be life disabling
> and potentially even life threatening for him and we should avoid
> anything that would potentially put that at risk in the future . . . [.]
> [T]he multiple prior surgeries he had and now [his] recent injury
> . . . certainly compromise[] his ability to continue to do this type of
> work . . . . At this point I feel he should not have any significant
> vigorous physical activity, no lifting greater than 15-20 pounds
> . . . and no work duties that would place him at risk for re-injury of
> any of this area again.

On April 19, 2006, Dr. King restated his belief that claimant should not return to any work that "involve[d] physical activity." He further noted that he "would consider [claimant] probably completely disabled but [would] recheck one more time a CT scan [in six weeks] just to reevaluate [the] hernia repair on him." On June 27, 2006, Dr. King wrote:

> [Claimant] had a CT scan done June 19, 2006. . . . At this point in time I feel like he has excellent overall outcome from his diaphragmatic hernia repair. I also feel strongly that the reason behind this is his overall limited activity and lifting restrictions. I think at any point in time if he were to go back to lifting greater than 20-25 pounds or any prolonged vigorous activity at all he would be in danger of repeat injury to his diaphragm or recurrence of his hernia. . . . I think he is well healed. I think he's chronically going to be in danger of having this recur for him. As long as he is able to maintain the above restrictions, no lifting greater than 20-25 pounds, no prolonged vigorous activity, no more than 1-2 hours worth of long standing and no prolonged ambulatory requirements, I think this hernia will remain repaired well for him. In essence I feel this would put him at complete disability probably for the remainder of his life.

On July 14, 2006, Dr. King further explicated claimant's work restrictions as follows:

> At this time, [claimant] is under restrictions to refrain from any extreme twisting or bending of his upper torso, no lifting, pushing, pulling anything over 20 pounds. That restriction is expected to remain unchanged and to be permanent. [Claimant] has a history of work for [employer] for 15 years as a construction coordinator which involved continuous field work. [Claimant] is unable to return to this type of work or any sort of previous occupation such as this. I do not expect that to change. [Claimant] is on a course of pain management therapy including Methadone . . . which also precludes . . . gainful employment operating any sort of machinery or driving at all. Given his current physical limitations, use of prescribed medications and significant life threatening risk of re-injury to his abdominal area, [claimant] is unable to resume this type of gainful employment. I do not expect that condition to change and I believe his inability to resume gainful employment is permanent. Return to employment is inadvisable given the risk of future complications.

On December 22, 2006, Dr. King reiterated the same work restrictions and noted that claimant was "otherwise doing well with no sign of recurrence of his diaphragmatic herniation."

The deputy commissioner kept the record open to allow employer to examine a QuickBooks Point of Sales disk that "should have been produced" by claimant but was not. By letter dated June 8, 2007, Robson reported that the disk showed "cost figures" for approximately 39% of the merchandise sold by Combat Solutions from March 13, 2006, to February 3, 2007. Those figures, Robson further reported, "resulted in an average gross profit percentage of 30.90"%. Using that gross profit margin instead of the original 30.34%, Robson calculated that the company had a corrected net income of $59,795 for 2006, which yielded an hourly rate of pay of $20.48 and an average weekly wage for claimant of $819. Robson also stated that the data on the disk reinforced his opinion that claimant "worked in the store on a nearly daily basis between March 13 and July 31, 2006" because it showed there were sales almost every day prior to the time claimant's wife and brother "got off work from their regular jobs."

In claimant's "rebuttal report" of June 22, 2007, Darrow questioned Robson's premise that claimant was the only person who worked in the store when claimant's wife and brother were not available. Darrow understood that Bahr, the former owner of the business, "continue[d] working during a transition period as part of the overall deal" to sell the business. Darrow further questioned the reliability of the data on the disk, noting that some of the cost figures inputted into the QuickBooks Point of Sale system were "patently ridiculous." He concluded that "the people inputting the cost figures" did not know how to use the system.

In an opinion issued August 1, 2007, the deputy commissioner determined that claimant had "returned to work with Combat Solutions" and that "wages should be imputed to . . . claimant for his services" to the company. Finding that claimant's services were "worth approximately $20.00 per hour" and that he averaged 16 hours of work per week for the company, the deputy commissioner concluded that a weekly wage of $320 was "a reasonable approximation" of claimant's light-duty earnings. On that basis, the deputy commissioner

- 13 -

awarded claimant temporary partial disability benefits in the amount of $567.74 per week, commencing July 11, 2006, and continuing. The deputy commissioner also granted employer a credit for overpayment and rejected claimant's assertion that employer's application lacked reasonable grounds and was filed in bad faith. Both parties sought review of the deputy commissioner's decision.

In an opinion issued January 31, 2008, the full commission affirmed the deputy commissioner's award. The commission agreed with the deputy commissioner that claimant was "working for Combat Solutions despite his stated physical inability to work" and that it was appropriate to impute wages to claimant for the labor he provided to the company. Reviewing the deputy commissioner's calculation of claimant's post-injury average weekly wage, the commission stated as follows:

> We find reasonable Robson's determination that the claimant provided labor to the business that should have been compensated in the form of wages. However, we find that he may have overstated the extent of the claimant's hours, particularly after Sebastian began working. The claimant performed services, but it is also not unreasonable to assume that some of his time in the shop was spent on personal activities and that his presence was not required. Robson also may have overstated the extent of the underreporting of sales, although the evidence does suggest there was some underreporting. Darrow disagreed that there could have been over $50,000 worth of underreported income, and stated that a first-year business often loses money. For these reasons, we decline to accept Robson's full-time average weekly wage calculation.
>
> Given the evidence presented, we can find no fault with the Deputy Commissioner's resolution of this case, imputing wages to the claimant of two days per week approximately based on Robson's hourly rate calculation, yielding an average weekly wage of $320.00. The Deputy Commissioner correctly changed the award to temporary partial and appropriately awarded a credit.

- 14 -

The commission further approved the deputy commissioner's rejection of claimant's motion for costs and sanctions, finding that the "proceedings were prosecuted on reasonable grounds" and employer did not act in bad faith.

Employer's appeal and claimant's cross-appeal to this Court followed.

## II. POST-INJURY AVERAGE WEEKLY WAGE

On appeal, both parties challenge the commission's imputation of a post-injury average weekly wage of $320 to claimant. Employer contends the commission erred in finding claimant worked only two days per week and in imputing an average weekly wage of only $320 to him as a result. Claimant contends the commission erred in finding he returned to work and in imputing earnings to him.[5] We disagree with both parties' contentions.

"On appeal from a decision of the Workers' Compensation Commission, the evidence and all reasonable inferences that may be drawn from that evidence are viewed in the light most favorable to the party prevailing below." Artis v. Ottenberg's Bakers, Inc., 45 Va. App. 72, 84, 608 S.E.2d 512, 517 (2005) (en banc). Moreover, "we are bound by the commission's findings of fact as long as 'there was credible evidence presented such that a reasonable mind could conclude that the fact in issue was proved,' even if there is evidence in the record that would support a contrary finding." Id. at 83-84, 608 S.E.2d at 517 (emphasis omitted) (quoting

---

[5] In separate questions presented on cross-appeal, claimant also contends that no "credible evidence support[s] the commission's finding that [he] earned $320.00 per week" and that "the commission err[ed] as a matter of law in discounting the weight it afforded to [employer's] accounting witness." However, claimant presents no argument or authority in his brief to support those questions presented. Rule 5A:20(e) requires that an appellant's opening brief contain '[t]he principles of law, the argument, and the authorities relating to each question presented.' Unsupported assertions of error 'do not merit appellate consideration.'" Jones v. Commonwealth, 51 Va. App. 730, 734, 660 S.E.2d 343, 345 (2008) (quoting Buchanan v. Buchanan, 14 Va. App. 53, 56, 415 S.E.2d 237, 239 (1992)). Because claimant's breach of the requirements of Rule 5A:20 is significant, his unsupported questions presented "are waived, and the judgment of the [commission] is affirmed without opinion as to whether error exists in the record." Parks v. Parks, 52 Va. App. 663, 664, 666 S.E.2d 547, 548 (2008), petition for appeal refused, No. 082302 (Va. Feb. 4, 2009).

Westmoreland Coal Co. v. Campbell, 7 Va. App. 217, 222, 372 S.E.2d 411, 415 (1988)). "This rule applies when an expert's opinion contains internal conflicts." Greif Companies/Genesco, Inc. v. Hensley, 22 Va. App. 546, 552, 471 S.E.2d 803, 806 (1996). "In determining whether credible evidence exists, the appellate court does not retry the facts, reweigh the preponderance of the evidence, or make its own determination of the credibility of the witnesses." Wagner Enters., Inc. v. Brooks, 12 Va. App. 890, 894, 407 S.E.2d 32, 35 (1991). Indeed, "[m]atters of weight and preponderance of the evidence, and the resolution of conflicting inferences fairly deducible from the evidence, are within the prerogative of the commission and are conclusive and binding on the Court of Appeals." Kim v. Sportswear, 10 Va. App. 460, 465, 393 S.E.2d 418, 421 (1990) (citation omitted).

"Unlike questions of fact," however, "we review questions of law *de novo*." Rusty's Welding Serv., Inc. v. Gibson, 29 Va. App. 119, 127, 510 S.E.2d 255, 259 (1999) (en banc). Thus, we are "not bound by the legal determinations made by the commission. 'We must inquire to determine if the correct legal conclusion has been reached.'" Cibula v. Allied Fibers & Plastics, 14 Va. App. 319, 324, 416 S.E.2d 708, 711 (1992) (quoting City of Norfolk v. Bennett, 205 Va. 877, 880, 140 S.E.2d 655, 657 (1965)), aff'd, 245 Va. 337, 428 S.E.2d 905 (1993).

Compensation benefits awarded pursuant to Code §§ 65.2-500 and 65.2-502 "cover losses occasioned by the impairment of the claimant's earning capacity" resulting from the claimant's compensable injury. Pilot Freight Carriers, Inc. v. Reeves, 1 Va. App. 435, 441, 339 S.E.2d 570, 573 (1986). Code § 65.2-500 applies "when the incapacity for work resulting from the injury is total," and Code § 65.2-502 applies "when the incapacity for work resulting from the injury is partial." Code § 65.2-502 provides that the compensation to be paid by an employer to an injured employee during the employee's partial incapacity for work is "66 2/3 percent of the difference between [the employee's] average weekly wages before the injury and *the average*

*weekly wages which [the employee] is able to earn thereafter.*"  (Emphasis added.)  In Pilot

Freight Carriers, we recognized that

> [t]he extent of incapacity must be ascertained from the evidence, and such is not limited to any special class of proof.  All legal facts and circumstances surrounding the claim should properly be considered and due weight given them by the [c]ommission.
> It [is] the duty of the [c]ommission to make the best possible estimate of [post-injury] impairments of earnings from the evidence adduced at the hearing, and to determine the average weekly wage that [the employee] was able to earn.  This is a question of fact to be determined by the [c]ommission which, if based on credible evidence, will not be disturbed on appeal.

1 Va. App. at 441, 339 S.E.2d at 573 (citation omitted).  Thus, we must uphold the commission's

findings regarding the employee's post-injury average weekly wage if credible evidence supports

those findings.

This case came before the commission on employer's application for a hearing alleging

that claimant had returned to work on or before July 11, 2006.  Reviewing the evidence

presented in the case, the commission agreed that claimant was "working for Combat Solutions

despite his stated physical inability to work" and that it was appropriate to impute wages to

claimant for the labor he provided the company.  Approving the deputy commissioner's

imputation of wages to claimant for 2 days, or 16 hours, per week of work at $20 per hour, for a

post-injury average weekly wage of $320, the commission affirmed the deputy commissioner's

award to claimant of temporary partial disability benefits in the amount of $567.74 per week,

commencing July 11, 2006, and continuing.

## A.  Employer's Claim of Error

The sole issue presented by employer is whether the commission erred in finding, for

purposes of calculating claimant's post-injury average weekly wage, that claimant worked only

two days per week for Combat Solutions.  Employer contends there was no credible evidence

presented to support that finding.  Indeed, employer maintains that, given claimant's "sworn

deposition testimony" that he was at the company's store 4 days per week and the fact that "no one else was available to keep the store open from March through . . . the end of August" when Sebastian was hired, the credible evidence presented at the hearing required a finding that claimant worked a minimum of 40 hours per week at the company's store. Hence, employer argues, the commission should have imputed an average weekly wage of "at least $800" to claimant. Thus, employer concludes, the commission erred in finding claimant worked only 2 days per week and imputing wages of only $320 to him. We find no merit in employer's claim.

Viewed in the light most favorable to claimant, the party who prevailed on this issue below, the credible evidence presented at the hearing established that claimant went to the company's store up to 4 days per week. However, with the exception of the private investigator's testimony that he observed claimant arrive at the store at approximately 11:00 a.m. and leave the store around 6:45 p.m. on July 20, no evidence established the actual number of hours claimant spent at the store on the days he was there. Likewise, the evidence failed to establish the precise number of hours claimant actually spent working at the store on the days he was there. While the evidence showed that claimant greeted and talked to customers, manned the front counter, rang up sales, answered the phone, taught a class, and worked alone for more than an hour on 15 to 20 occasions while at the store, the evidence also demonstrated that he spent a significant portion of his time at the store in the backroom watching television, playing solitaire, and taking naps. The investigator saw him actually working at the store only during relatively brief periods of time. Nothing established that he had an actual schedule requiring him to be there 40 hours a week or that he worked 10-hour shifts when he went to the store. Thus, even if the evidence supported employer's claim that claimant went to the store 4 days per work, no evidence proved that claimant worked 10 hours per day, or 40 hours per week.

Employer also argues that the commission erroneously failed, in finding claimant worked only 2 days per week for Combat Solutions, to take into account the time claimant spent working for the company outside the company's store, including attending a gun show, signing 139 checks for the company, executing a contract with an accountant, and driving a vehicle with a company logo emblazoned on it. We reject employer's argument as meritless. For one thing, nothing in the record indicates the commission did not take these activities into account when it determined that claimant worked for the company only 2 days, or 16 hours, per week. To the contrary, the commission referenced each activity in its opinion and expressly considered "the evidence presented" in affirming the deputy commissioner's finding that claimant worked 2 days per week for the company. Moreover, there was no evidence presented showing that claimant signed the checks or contract while outside of the store. The commission could have reasonably concluded that the checks and contract were executed while claimant was working at the store. Likewise, we refuse to accept employer's invitation to conclude, as a matter of law, that the mere act of driving a vehicle emblazoned with a company's logo on it constitutes, in this context, time spent working for the company. While the driving of such a vehicle may show that an individual is associated with a particular company, the time spent driving such a vehicle during non-working hours, be it to church, the doctor's office, a distant vacation site, or even to or from work—all comparable acts of displaying the company's logo—is no more "time spent working" in the instant context than the act of driving an unmarked vehicle under the same circumstances. Indeed, carried to its logical extreme, employer's position would lead to the absurd result of having the time an emblazoned vehicle is parked in a location where the logo may be viewed by others counted as time working for the company whose logo it is.

Similarly, we reject employer's contention that the commission had to find claimant worked at least 40 hours per week because he was the only person available to work in the store

during the week "from March through . . . the end of August." That contention ignores the credible evidence establishing, under our standard of review, that, after selling the business to claimant and his wife, Bahr continued to work at the company's store until he left to attend the police academy in late 2006. Indeed, between March 3, 2006, and November 15, 2006, the company issued at least 20 checks to Bahr totaling $5,094. The commission could reasonably conclude from this evidence, in combination with the evidence that claimant's wife and brother worked Saturdays at the store and that claimant's wife worked weekday evenings, Fridays, and some Wednesday afternoons, that, before Sebastian was hired in late August, Bahr worked at the store during the hours not covered by claimant, his wife, and his brother.

We conclude, therefore, that credible evidence supports the commission's finding that the claimant did not work 40 hours per week as employer claims. Weighing the evidence and resolving the numerous conflicting issues of fact therein, the commission found that claimant worked 2 days, or a total of 16 hours, per week for the company. Because that finding falls within the time range reasonably supported by the credible evidence, we cannot say the commission erred in making that finding.

### B. Claimant's Claims of Error

Claimant challenges the commission's imputation to him of a post-injury average weekly wage on two grounds: First he maintains the commission's threshold finding that he returned to work is unsupported by the evidence. Second, he contends the commission erred as a matter of law in imputing earnings to him. We reject both of claimant's claims as meritless.

### 1. Return to Work

Relying on Bay Concrete Construction Co. v. Davis, 43 Va. App. 528, 600 S.E.2d 144 (2004), claimant contends the commission erred in finding he returned to work, because the "uncontradicted medical evidence" established that he had no residual work capacity and was

- 20 -

therefore "unable to perform gainful employment." Finding credible evidence in the record to support the commission's factual determination that claimant returned to work, we disagree.

Viewed in the light most favorable to employer, the party who prevailed on this issue below, the medical evidence established that, throughout his treatment of claimant, Dr. King believed that "any re-injury of [claimant's] diaphragm would be life disabling and potentially even life threatening" and that claimant "should avoid anything that would potentially put [his diaphragm] at risk." Thus, Dr. King placed claimant "under restrictions to refrain from any extreme twisting or bending of his upper torso," "lifting, pushing, pulling anything over 20 pounds," "prolonged vigorous activity, . . . more than 1-2 hours worth of long standing and . . . prolonged ambulatory requirements." The doctor explained that claimant's work restrictions were "expected to remain unchanged and to be permanent." Accordingly, Dr. King opined that claimant would never be able "to return to [his pre-injury] type of work" as a contract inspector, "which involved continuous field work." In light of the "significant life threatening risk of re-injury to his abdominal area," Dr. King concluded that claimant would be "unable to resume [that] type of gainful employment." He added that claimant's "inability to resume gainful employment [was] permanent."

Focusing on Dr. King's statement that claimant's "inability to resume gainful employment [was] permanent," claimant argues that "[t]he evidence was uncontradicted [that claimant] remained totally disabled." Claimant's argument ignores the light-duty restrictions imposed by Dr. King and the fact that, given its context, Dr. King's opinion that claimant's "inability to resume gainful employment [was] permanent" was properly subject to a different interpretation by the commission. Indeed, where Dr. King's statements "conflict with each other, the commission, as fact finder, was entitled to determine the weight, meaning, and credibility to give his . . . statements and to reconcile any possible conflicts therein." Henrico

County Sch. Bd. v. Etter, 36 Va. App. 437, 445, 552 S.E.2d 372, 375 (2001). Resolving any possible conflicts in Dr. King's opinions in favor of employer, the commission was entitled to find that, while claimant's condition permanently prevented him from returning to his pre-injury employment as a contract inspector or any similar work requiring vigorous physical activity, he was physically capable of performing light-duty work consistent with his work restrictions.

This finding is also supported by the actual light-duty work claimant performed for Combat Solutions. The evidence established he went to the company's store up to 4 days per week where he taught a firearms class, rang up sales, answered the telephone, worked at the front counter, and greeted and assisted customers. He worked alone in the store for more than 1 hour approximately 15 to 20 times and was seen demonstrating a rifle to a customer. He also wrote checks, executed a contract, and worked at a gun show on behalf of the company. As fact finder, the commission could reasonably find from this evidence and the medical evidence that claimant had the physical capacity to return to light-duty work and actually did so with Combat Solutions.

Moreover, claimant's reliance on Bay Concrete is misplaced. In that case, Davis, the claimant, received temporary total disability benefits from the carrier as well as voluntary payment of lost wages from the employer during a period of total disability. 43 Va. App. at 531-32, 600 S.E.2d at 146. Davis did not work during the period he received compensation from both the carrier and the employer. Id. at 534, 600 S.E.2d at 147. "The undisputed evidence established that [Davis] was totally disabled during the relevant period." Id. at 539, 600 S.E.2d at 150. The employer made the voluntary payments to Davis "not for any work he actually did but solely in the hope that he would remain a loyal employee and eventually return to work for employer." Id. The employer sought a credit for the payments it made to Davis, claiming they were unreported "earnings." Id. at 536, 600 S.E.2d at 148. Noting that "'the commission must compare the claimant's pre-injury average weekly wage to *the wage he is able to earn* after the

- 22 -

injury,'" we held that, "because of [Davis's] total physical disability, he was not able to earn any wage during the period in question, and thus, he had no 'earnings.'" Id. at 539, 600 S.E.2d at 150 (quoting Smith v. Robert W. Smith, 32 Va. App. 242, 250, 527 S.E.2d 463, 467 (2000) (emphasis added)).

Here, however, unlike in Bay Concrete where it was undisputed that Davis was totally disabled and there was no suggestion that Davis's actual activities during the period of disability constituted work, claimant was not totally disabled and was actually performing work. Accordingly, Bay Concrete is factually distinguishable and thus inapplicable in this case.

Because the medical evidence and claimant's actual work activities on behalf of the company support the commission's factual determination that claimant returned to work, we will not disturb that finding.

## 2. Imputation of Earnings

Relying on Smith, claimant contends the commission erred, as a matter of law, in imputing earnings to him because the commission improperly based its imputation of earnings on the company's profits rather than his wages. He argues that he did not earn any wages from Combat Solutions because, even if he did return to work, he did not receive a paycheck from Combat Solutions and did not engage in any work activities "that significantly contributed to the business." Thus, he concludes, the commission's decision to impute earnings to him "should be reversed." We disagree.

After finding claimant was no longer totally disabled, the commission was required under Code § 65.2-502 "to determine the average weekly wage . . . [he] was able to earn." Pilot Freight Carriers, 1 Va. App. at 441, 339 S.E.2d at 573. That determination, "if based on credible evidence, will not be disturbed on appeal." Id.

- 23 -

In Pilot Freight Carriers, the injured employee returned to work supervising and managing his own trucking business shortly after suffering an injury while working for the employer. Id. at 437, 339 S.E.2d at 571. The employer, who had accepted the injury as compensable and was making temporary total disability payments to the employee, filed an application seeking termination of the temporary total disability award. Id. at 437-38, 339 S.E.2d at 571. The commission dismissed the employer's application, finding that "'[t]he supervisory work being performed by [the employee] may have some value but there [was] no evidence before us in this regard.'" Id. at 442, 339 S.E.2d at 573. Concluding it was supported by the record, we affirmed the commission's finding and added that "[w]e [did] not mean to imply that owning and operating a business [could] never be a sufficient reason to hold that the employee [was] able to return to work" and earn a wage. Id.

Here, unlike in Pilot Freight Carriers, the commission had ample evidence before it regarding the value of the light-duty work claimant performed for Combat Solutions. The evidence presented at the hearing identified several work activities engaged in by claimant that significantly contributed to the business, such as teaching a class, ringing up sales, attending a gun show, assisting customers, and answering phones. The evidence further provided the commission with the means to ascertain the value of that work and determine the average weekly wage claimant was able to earn, notwithstanding his lack of an actual paycheck. Based on that evidence, the commission found that claimant worked approximately 16 hours per week and that his efforts were worth approximately $20 per hour. Accordingly, the commission imputed to claimant an average weekly wage of $320.

In Smith, the claimant, Smith, was injured while operating a sole proprietorship. 32 Va. App. at 246, 527 S.E.2d at 465. Before the injury, he "worked an average of over forty hours per week and was paid at the rate of $25 per hour for an average total of $1,000 per week."

Id. After the injury, "he was unable to work." Id. During the period of his disability, however, Smith received draws from the company that averaged over $1,500 per week. Id. at 246-47, 527 S.E.2d at 466. The commission determined that Smith was not entitled to wage loss benefits because, even though he was unable to work and earn the wage he had received before the injury, his net income had not decreased because he continued to receive a draw from the business. Id. at 248, 527 S.E.2d at 466. We reversed the commission's decision, holding "that, to the extent the commission included business profits rather than wages or their equivalent in its calculation of [Smith's] . . . post-injury wage, the commission erred." Id. at 256, 527 S.E.2d at 470.

Here, by contrast, claimant was able to and did work for Combat Solutions after his injury. He was not a passive investor; he actually provided labor that financially benefited the company. Indeed, had claimant not performed the work, the company would in all likelihood have had to pay someone else to do it. Moreover, unlike in Smith, claimant was not entitled to share in the company's profits since wife was the sole shareholder. Accordingly, the commission was entitled to conclude that "claimant provided labor to the business that should have been compensated in the form of wages." To conclude otherwise would allow an officer in a small, family-owned company to defeat the worthy purpose of the Workers' Compensation Act and receive a windfall by simply showing he was not earning any *documented* wages.

To calculate claimant's post-injury average weekly wage, the commission assigned an hourly value to claimant's work and multiplied that figure by the number of hours per week it determined claimant worked for the company. The average weekly wage the commission imputed to claimant was based solely on the commission's determination of the value of the work claimant performed. Because the commission's determination is supported by credible evidence, we must uphold it.

- 25 -

III.  COSTS AND FEES

Claimant contends the commission abused its discretion in refusing to assess fees and costs against employer.  We disagree.

The decision to assess fees or costs rests in the sound discretion of the commission and will be reversed only for an abuse of that discretion.  <u>Volvo White Truck Corp. v. Hedge</u>, 1 Va. App. 195, 200-01, 336 S.E.2d 903, 906 (1985).  Code § 65.2-713 provides, in pertinent part, as follows:

> A.  If the Commission or any court before whom any proceedings are brought or defended by the employer or insurer under this title shall determine that such proceedings have been brought, prosecuted, or defended without reasonable grounds, it may assess against the employer or insurer who has so brought, prosecuted, or defended them the whole cost of the proceedings, including a reasonable attorney's fee, to be fixed by the Commission.
>
> B.  Where the Commission finds that an employer or insurer has delayed payment without reasonable grounds, it may assess against the employer or insurer the whole cost of the proceedings, including a reasonable attorney's fee to be fixed by the Commission. . . .
>
> C.  Where the Commission finds that an employer or insurer has filed an application for a hearing in bad faith, it shall assess against the employer or an insurer an amount up to ten percent of the total amount of the benefits accrued from the date the Commission determined the award should have been paid through the date of the award.[6]

Citing no authority for his position, claimant argues on appeal, as he did below, that cost and fees should have been assessed against employer because employer's first two applications for a hearing were rejected by the commission for lack of compliance with the commission's rules.  The first application, which was filed on October 4, 2006, was rejected because "the

---

[6] In limiting his claim of error to the commission's decision not to assess *fees and costs* against employer, claimant has evidently abandoned his request for the assessment against employer of "a ten percent penalty on all compensation unjustly withheld" by employer.

investigative report was not signed or submitted under oath." The second application, which was filed on November 1, 2006, was rejected because it "was not properly submitted under oath" in that "no date [was] provided on the application as to when it was notarized."

The commission declined to assess fees and costs against employer, noting as follows:

> After reviewing the file, we find no grounds on which to award an assessment of costs. We have considered the prior applications filed by the employer that were rejected . . . . The carrier in this case faced an uphill battle in demonstrating a return to work given the fact that the claimant was working in a small, family run business and was not earning any documented wages. We find no evidence that the carrier acted in bad faith, and we certainly find that these proceedings were prosecuted on reasonable grounds.

It is clear that the commission considered the rejected applications and the one filed on November 8, 2006, and found they were neither filed in bad faith nor brought without reasonable grounds. The commission further found implicitly that employer did not delay payment without reasonable grounds. We cannot say, based on the record before us, that the commission's rulings were arbitrary or capricious, or otherwise unreasonable. Accordingly, we hold the commission did not abuse its discretion under Code § 65.2-713 in refusing to assess fees and costs against employer. See Rusty's Welding Serv., 29 Va. App. at 130, 510 S.E.2d at 261 (holding that the commission does not abuse its discretion when "the exercise of its discretion . . . [is] reasonable and not arbitrary or capricious").

## IV. CONCLUSION

For these reasons, we affirm the judgment of the commission.

Affirmed.