S13A0096. YANCEY v. THE STATE.
(740 SE2d 628)

BLACKWELL, Justice.

Appellant Derrick Yancey was tried by a DeKalb County jury and convicted of the murder of his wife, Lynda Yancey,[1] the murder of Marcial Puluc, a day laborer whom Appellant had employed, and the unlawful possession of a firearm during the commission of a felony. On appeal, Appellant contends that the trial court erred when it admitted testimony at trial and allowed the prosecuting attorney to make arguments in summation that referred to Appellant having exercised his right to remain silent, that he was denied the effective assistance of counsel to the extent that his lawyers failed to object to such testimony and argument, and that the trial court erred when it refused at a hearing on his motion for new trial to hear expert

---

[1] To be clear, we refer in this opinion to Derrick Yancey as "Appellant" and to his late wife as "Ms. Yancey."

testimony that he offered in support of another claim of ineffective assistance. Upon our review of the record and briefs, we see no error, and we affirm.[2]

1. Viewed in the light most favorable to the verdict, the evidence shows that Appellant and Ms. Yancey were having marital problems in early 2008, and Appellant had been talking about a divorce. On June 8, Appellant — who was employed as a DeKalb County deputy sheriff — called and informed his supervisor that he would not be available to work on the following day because "he had something to do." On the morning of June 9, Appellant went to a place where day laborers frequently gathered to seek employment, and he hired Puluc — a native of Guatemala who spoke no English and had been in the United States for only about a month — to do some work at the home that Appellant and Ms. Yancey shared.

Appellant brought Puluc to the home, where he worked in the yard for most of the morning. Around lunchtime, Appellant offered some food to Puluc, and according to Appellant, he left Puluc alone in the kitchen to eat lunch. Ms. Yancey had been away from the home in the morning, but she returned shortly after noon, and around that time, Appellant asked Puluc to mow the lawn.[3] A little while later, Appellant called 911 and reported that a day laborer had robbed and shot Ms. Yancey and that Appellant, in turn, had shot the day laborer. Appellant told the 911 operator that he was attempting to render aid to Ms. Yancey, and he allowed the operator to instruct him on the proper administration of cardiopulmonary resuscitation (CPR), notwithstanding that he previously had been certified in CPR administration. After Appellant supposedly had performed CPR for a short time, the operator heard him walk away, something that she characterized as unusual in her experience. Appellant also told the

---

[2] The events that form the basis for the convictions occurred on June 9, 2008. Appellant was indicted on August 14, 2008 and charged with two counts of malice murder and two counts of unlawful possession of a firearm during the commission of a felony. His trial commenced on October 12, 2010, and the jury returned its verdict on November 3, 2010, finding Appellant guilty on all counts. Appellant was sentenced to consecutive terms of imprisonment for life for the murders and consecutive terms of imprisonment for five years for unlawful possession of a firearm. Appellant filed a motion for new trial on December 14, 2010, and he amended it on September 6, 2011 and again on June 1, 2012. The trial court denied the motion on June 13, 2012. Appellant timely filed a notice of appeal on July 12, 2012, and the case was docketed in this Court for the January 2013 term and submitted for decision on the briefs.

[3] Testimony at trial showed that, although Appellant sometimes hired day laborers to work around his home, he did not usually hire only one day laborer at a time, as he did when he hired Puluc. And his request that Puluc mow the lawn was unusual as well, inasmuch as he ordinarily never would have permitted a "random" day laborer to mow his "golf course[-]like" lawn.

operator that Puluc was moaning, and when she asked about the gun that Puluc supposedly had used, Appellant said, "I got it. I got it away from him."

Police officers arrived at the home within ten minutes of the 911 call, and when they arrived, they observed Appellant in his driveway, holding his service weapon, a Heckler & Koch semiautomatic handgun. When the officers went to the basement of the home, they found Ms. Yancey and Puluc, both dead. Ms. Yancey had sustained a contact gunshot wound to her left breast, another gunshot wound to her left breast as a result of a shot fired at close range, and a contact gunshot wound to her neck. All the wounds to Ms. Yancey had been inflicted with a .357 Smith & Wesson (S&W) revolver that Appellant owned. Puluc lay ten feet away from Ms. Yancey. Puluc had sustained three gunshot wounds as well, all inflicted with the H&K handgun. A significant amount of currency — approximately $2,000 — was found on the floor near Ms. Yancey. And the S&W revolver that had been used to shoot Ms. Yancey — the revolver that Appellant supposedly had secured — was found on the floor by Puluc's left side.

Paramedics arrived soon after the police officers, and Appellant spoke with one of the paramedics. Appellant explained that he had hired Puluc to move furniture.[4] Appellant said that he and Ms. Yancey had been together in the basement, that he gave Ms. Yancey a significant amount of money, that Puluc was present when he did so, that Puluc pulled out Appellant's revolver, and that Puluc demanded the money, instructing Ms. Yancey to "[g]ive me all your money."[5] Puluc then shot Ms. Yancey, Appellant said, and he shot Puluc in response.

Later that day, Appellant voluntarily went to a police station to give a statement to investigating officers. At the time he did so, Appellant was not in custody, he was permitted to come and go as he pleased, and he had unlimited access to a telephone. Appellant told officers, among other things, that Puluc and Ms. Yancey had struggled over the money, that Puluc shot Ms. Yancey in the course of the struggle, and that Puluc successfully wrested the money from Ms. Yancey. Appellant also said that he kept his S&W revolver on top of the refrigerator, and Puluc must have taken it, Appellant surmised, when he was left alone in the kitchen to eat lunch.[6] As Appellant was signing a written statement at the police station, a detective noticed

---

[4] Puluc stood only five feet, three inches and weighed less than 120 pounds.

[5] Remember that Puluc spoke no English, according to the evidence at trial.

[6] This statement was contradicted at trial by Appellant's daughter, who testified that she never had known Appellant to keep his revolver atop the refrigerator and also that she never had known Appellant to leave a day laborer unsupervised in the home.

"very small dots" on his right hand, which were consistent with blood spatter from a contact gunshot. Officers collected swabs of blood from Appellant's right hand and shin, and they also collected his clothing and gave him something else to wear. The officers then asked Appellant to draw a diagram of the crime scene, but Appellant at that point asked to speak to an attorney, refused to draw a diagram, and left the police station when his attorney arrived.

Forensic analyses of the crime scene and physical evidence indicated that Ms. Yancey and Puluc could not have been killed in the way that Appellant had described. For instance, although Ms. Yancey suffered two contact gunshot wounds and a third wound from a gunshot fired at close range — all supposedly as a result of Puluc shooting Ms. Yancey as they struggled for the money — her blood spatter was found not on Puluc, but instead on Appellant. The money that Puluc supposedly had taken from Ms. Yancey was found not by his body, but near hers, about ten feet away from Puluc. Puluc was right-handed, but the revolver was found not to his right, but to his left. And although Appellant had claimed to the 911 operator that he administered CPR to Ms. Yancey, CPR had not, in fact, been performed.

In addition to this evidence, the record shows that after Appellant was arrested for the murders of Ms. Yancey and Puluc, he was released on bond and confined to his home, the confinement to be monitored with an ankle monitor. Appellant, however, removed the monitor and fled to Belize. He later was apprehended in Belize and returned to the United States for trial. Although Appellant does not dispute that the evidence is sufficient to sustain his convictions, we have reviewed the entire record, and we conclude that the evidence adduced at trial was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Appellant was guilty of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). See also *Poole v. State*, 291 Ga. 848, 850 (1) (734 SE2d 1) (2012).

2. On appeal, Appellant claims that the trial court improperly permitted witnesses for the prosecution on four occasions to give testimony that touched upon his exercise of his right to remain silent. On the first occasion, the prosecuting attorney asked an officer who interviewed Appellant at the police station what happened after Appellant made his written statement, and the officer responded that "[we] requested . . . that he draw us a diagram [of the crime scene]." On the second occasion, the prosecuting attorney asked the same officer what happened after photographs were taken of the crime scene, and the officer responded that "Mr. Yancey was asked to help us by mapping out or drawing a diagram for —." On the third

occasion, the prosecuting attorney asked the same officer what happened after Appellant was asked to draw a diagram, and the officer responded that "[h]e chose to leave." And on the fourth occasion, the prosecuting attorney asked another officer whether Appellant was asked to draw a diagram only after he was given new clothing, and the officer responded in the affirmative.

Appellant failed to object at trial, however, on the first, third, and fourth occasions of the testimony about which he now complains. And although Appellant did object on the second occasion, he objected on a different ground than the one he urges on appeal. On the second occasion, after the officer said that "Mr. Yancey was asked to help us by mapping out or drawing a diagram for —," Appellant moved for a mistrial on the ground that the testimony amounted to a comment upon his request to consult a lawyer, noting at a sidebar conference that Appellant refused to draw the diagram at the "moment he asked for an attorney." The trial court denied the motion, finding that the testimony "[had] not gone into Mr. Yancey's request for an attorney." On appeal, Appellant no longer contends that the testimony given on the second occasion amounted to an impermissible comment on his request for a lawyer, but he instead argues that it amounted to a comment on his silence with respect to drawing a diagram. In these circumstances, Appellant has failed to preserve the claim of error that he asserts on appeal as to the testimony on the first, third, and fourth occasions, and it is doubtful that he has preserved it as to the testimony on the second occasion. See *Sears v. State*, 292 Ga. 64, 67 (3) (734 SE2d 345) (2012); *Wallace v. State*, 272 Ga. 501, 503 (2) (530 SE2d 721) (2000); *Klinect v. State*, 269 Ga. 570, 574 (6) (501 SE2d 810) (1998).

Even assuming, however, that Appellant adequately preserved his claim of error, we would find no reversible error in the trial court permitting testimony about his failure to draw a diagram. A comment upon the invocation of the right to remain silent in the course of a custodial interview, and after the reading of the *Miranda* warnings[7] raises constitutional concerns, see *Whitaker v. State*, 283 Ga. 521, 524 (3) (661 SE2d 557) (2008), but in this case, of course, Appellant was not in custody at the time he declined to draw a diagram, and he had not been warned of his rights under *Miranda*. Appellant does not contend that the testimony about which he complains implicated constitutional concerns, but he instead relies on *Mallory v. State*, 261

---

[7] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

Ga. 625, 629-630 (5) (409 SE2d 839) (1991),[8] where we recognized as a general rule of evidence that, "in criminal cases, a comment upon a defendant's silence or failure to come forward is far more prejudicial than probative." This is not a case, however, that is governed squarely by the principle set forth in *Mallory*.[9]

In this case, Appellant did not remain silent, nor did he fail to come forward. To the contrary, Appellant voluntarily went to a police station, he voluntarily made a statement that included self-serving representations about Puluc having robbed and shot Ms. Yancey, he chose to cease his ostensible cooperation with the investigating officers only after they asked him for a diagram of the crime scene, and he never explicitly invoked his right to remain silent. In these circumstances, the *Mallory* principle did not require the exclusion of testimony about his failure to draw a diagram upon the request of the investigating officers. See *Curry v. State*, 291 Ga. 446, 451 (3) (729 SE2d 370) (2012) ("As Curry did not invoke his right to remain silent during the interview, the testimony regarding Curry's failure to respond to [particular] questions [while providing his statement] was admissible." (citation omitted)); *Rogers v. State*, 290 Ga. 401, 406 (2) (721 SE2d 864) (2012) (an expressed desire not to discuss a particular subject while giving a statement to police is not an "invocation of the right to silence so as to raise the concerns addressed in *Mallory v. State*" (punctuation omitted)); *Gilyard v. State*, 288 Ga. 800, 802 (2) (708 SE2d 329) (2011) (because defendant spoke with police without ever invoking his right to remain silent, questions from the prosecuting attorney about why he had not come forward sooner "did not constitute impermissible commentary on [his] right to remain silent" (citations omitted)); *Stringer v. State*, 285 Ga. 842, 846 (4) (674 SE2d 590) (2009) (where defendant did not avail himself of the right to remain silent, but instead provided a statement to police, "the jury surely was entitled to know" about the failure of the defendant to say anything to the police about an alibi); *McMichen v. State*, 265 Ga. 598, 606 (11) (a) (458 SE2d 833) (1995) (where defendant made a statement to police officers, it was not an impermissible comment on his right to remain silent to ask about his failure to mention his claim of

---

[8] *Mallory* was overruled on other grounds in *Clark v. State*, 271 Ga. 6, 9-10 (5) (515 SE2d 155) (1999).

[9] *Mallory* was decided, of course, under the old rules of evidence, which also properly were applied in this case, which was tried before the effective date of our new Evidence Code. Although the State asks us to consider whether *Mallory* was abrogated by the new Evidence Code, this is not the right case in which to resolve that question. We offer no opinion about the continuing viability of *Mallory* under the new Evidence Code.

self-defense in that statement). Accordingly, even a timely objection to the testimony about which Appellant complains might properly have been overruled.

3. Appellant also claims that the prosecuting attorney improperly referenced his failure to draw a diagram in closing argument, but Appellant failed to object to the closing argument, so this claim is not preserved for review. *Doyle v. State*, 291 Ga. 729, 732 (2) (733 SE2d 290) (2012). In any event, because evidence about the failure to draw a diagram properly was admitted, it was not improper for the prosecuting attorney to reference that evidence in closing. See *Mikell v. State*, 286 Ga. 434, 438 (5) (689 SE2d 286) (2010) (references in closing argument to evidence of defendant's failure to come forward were not improper because the references were "derived from evidence properly before the factfinder" (citation omitted)), overruled on other grounds, *Manley v. State*, 287 Ga. 338, 345 (3) (698 SE2d 301) (2010). In addition, Appellant complains that, in connection with the references to his failure to draw a diagram, the prosecuting attorney attributed statements to him that he did not make, arguing that Appellant said, "I got to go . . . I'm not helping you," when asked by officers to draw a diagram. Again, Appellant failed to object, and this claim is not preserved for review. Even if he had objected, however, a lawyer has wide latitude in closing argument to remark upon the evidence that has been adduced at trial, *Banks v. State*, 281 Ga. 678, 682 (4) (642 SE2d 679) (2007), and he "may draw reasonable inferences or deductions from the evidence." *Messick v. State*, 276 Ga. 528, 529 (2) (580 SE2d 213) (2003) (footnote omitted). The words that the prosecuting attorney attributed to Appellant were, we think, an arguably fair statement of what Appellant effectively communicated to the officers by his leaving the police station, and if a timely objection had been made, it would have been within the discretion of the trial judge to overrule it.

4. Appellant contends that he was denied the effective assistance of counsel when his lawyers did not object or raise the proper objection to the testimony and arguments discussed in Divisions 2 and 3 above. To prevail on a claim of ineffective assistance, Appellant must prove both that the performance of his lawyers was deficient and that he was prejudiced by this deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To show that the performance of his lawyers was deficient, Appellant must prove that they performed their duties at trial in an objectively unreasonable way, considering all the circumstances, and in the light of prevailing professional norms. Id. at 687-688 (III) (A). See also *Kimmelman v. Morrison*, 477 U. S. 365, 381 (II) (C) (106 SCt 2574, 91 LE2d 305) (1986). As a matter of law, a failure to interpose

a meritless objection does not amount to unreasonable performance. *Bradley v. State*, 292 Ga. 607, 613 (5) (740 SE2d 100) (2013). Because the trial court would not have been required to sustain objections to the testimony and arguments about which Appellant complains, the failure of his lawyers to make such objections does not show that Appellant was denied the effective assistance of counsel.

5. Last, Appellant claims that the trial court erred when it refused to hear certain expert testimony at the hearing on his motion for new trial, testimony that concerned, he contends, his claim that his trial lawyers also were ineffective because they failed to adequately limit the trial testimony of a prosecution expert. Before trial, Appellant moved to suppress the testimony of Cecil Hutchins, a blood spatter expert for the State, arguing that Hutchins had made a warrantless entry into Appellant's home to inspect it, and for that reason, his testimony ought to be disallowed. The State conceded the unlawful entry, and the prosecuting attorney agreed that the State would not elicit testimony from Hutchins based on things that he learned as a result of the unlawful entry. With this agreement, the trial court ruled that Hutchins still could testify at trial, so long as he limited his testimony to things that he learned through other, lawful means, and Hutchins eventually did testify at trial that the crimes did not occur as claimed by Appellant. In his motion for new trial, Appellant claimed that Hutchins testified in violation of the pretrial agreement and ruling in limine, but his trial lawyers did not object to this testimony, which amounted, he said, to ineffective assistance.

At the hearing on the motion for new trial, the court heard from the lawyers who represented Appellant at trial, and they testified that they consulted an independent expert who "wrote the book" on blood spatter evidence.[10] Based on these consultations, and unfortunately for Appellant, the trial lawyers learned that their own consulting expert, using lawfully-obtained evidence, had reached the same conclusion as Hutchins, namely that the crimes did not occur as Appellant had claimed. The trial lawyers attempted, but could not find, another expert willing to testify otherwise. Consequently, the trial lawyers had no basis on which to object to the conclusion to which Hutchins testified at trial on the ground that it necessarily must have been based on the unlawful entry, inasmuch as their own expert had reached the same conclusion. In the light of this evidence, the trial

---

[10] The record shows that the expert hired to consult with the trial lawyers was the author of "several books" on blood spatter analysis. Appellant does not appear to question the qualifications or credentials of this expert.

court concluded that Appellant was not denied the effective assistance of counsel with respect to the trial testimony of Hutchins, a ruling that Appellant does not directly claim as error on appeal.

Instead, Appellant complains that the trial court at the hearing on the motion for new trial did not also hear from a "new" expert witness that Appellant found and engaged after his trial, an expert who evidently would have testified that the opinion testimony of Hutchins must have been based, at least in part, on his unlawful entry. Although his argument on this claim of error is somewhat confusing, we understand Appellant to argue that the testimony of the new expert was relevant to show that Appellant was prejudiced by the failure of his lawyers to object when Hutchins testified at trial. But there is no need for a trial court to hear evidence on prejudice in connection with an ineffective assistance claim when the claim fails necessarily because the defendant cannot show deficient performance. And the testimony of the new expert could not show deficient performance because the trial lawyers consulted with a qualified expert, their consultations gave them no basis for objecting to the conclusion reached by Hutchins, and they were under no obligation to search further than they did for an expert who would give them an opinion otherwise. *Smith v. State*, 283 Ga. 237, 238-239 (2) (a) (657 SE2d 523) (2008). Even if the new expert were able to provide evidence that would be favorable to the defense in hindsight, "the reasonableness of counsel's conduct must be viewed under the circumstances of the case that existed at the time counsel's decision was made and cannot be judged by hindsight." Id. (citations omitted). Regardless of his claim of prejudice, Appellant failed to show that his lawyers performed inadequately with respect to Hutchins,[11] and the exclusion of evidence that touched only upon prejudice was not error. See *Hendricks v. State*, 290 Ga. 238, 243 (5) (719 SE2d 466) (2011) ("Of course, it is not error to exclude irrelevant evidence from a hearing on a motion for new trial." (citation omitted)).

*Judgment affirmed. All the Justices concur.*

DECIDED APRIL 29, 2013.

*Long D. Vo*, for appellant.

---

[11] We note that Appellant failed at the hearing on his motion for new trial to call either Hutchins or the expert with whom his trial lawyers consulted.

*Robert D. James, Jr., District Attorney, Leonora Grant, Assistant District Attorney, Samuel S. Olens, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Clint C. Malcolm, Assistant Attorney General*, for appellee.