## S10A1235. HILTON v. THE STATE.
### (702 SE2d 188)

NAHMIAS, Justice.

Freddie Hilton was convicted of murder and other crimes stemming from the November 3, 1971, shooting of City of Atlanta Police Officer James Green.[1] For the reasons that follow, we affirm.

---

[1] The crimes occurred on November 3, 1971. Hilton was indicted on July 12, 2002, for

1. The evidence at trial, viewed in the light most favorable to the verdict, showed the following. Shortly after 12:00 a.m. on November 3, 1971, Officer Green was shot three times and killed while he was sitting in a parked police van. One bullet struck him on the left side of the head, another bullet struck him on the left side of the neck, and the third bullet struck him in the shoulder. Officer Green's badge and his Smith & Wesson .38 caliber revolver had been stolen. Forensic evidence established that Officer Green was shot with two different .38 caliber revolvers, both from manufacturers other than Smith & Wesson.

In November 1971, Hilton and several other people were members of a cell of the Black Liberation Army ("BLA") that came to Atlanta. Ronald Anderson, a cell member, testified that John Thomas was the leader of the group and that the cell did not engage in any criminal activity without his approval. Thomas was about 35 years old and the rest of the members were 17 to 20 years old. Anderson testified that, early one morning around November 3, 1971, Hilton woke him up and told him that Hilton and Twymon Myers, another cell member, had "shot a cop." Hilton gave Anderson a bag containing a .38 caliber revolver and a police officer's badge and asked him to dispose of the items. Anderson drove around Atlanta looking for a place to dispose of the items, but did not do so, because he was "petrified." He returned to the cell's house and returned the gun and badge to Hilton. The next day, when Hilton, Thomas, and Myers were not at the house, Anderson, along with other cell members who were concerned about the killing, attempted to leave Atlanta, but they were arrested by DeKalb County authorities before they could do so and charged with some armed robberies. Anderson testified that he volunteered information about Officer Green's killing to DeKalb officials while awaiting trial. However, Anderson and the other cell members escaped from jail shortly after that statement.

Malik Abdur-Razzaq, a cell member known as Bobby Brown in the early 1970s, testified that he was in Chattanooga, Tennessee, the day Officer Green was murdered, but he left there and came back to Atlanta. He added that, when he arrived, Hilton told him that he had

malice murder, two counts of felony murder, aggravated assault, and armed robbery. On November 13, 2003, the jury found Hilton guilty on all counts, and the trial court sentenced him to life in prison for malice murder and to ten consecutive years for armed robbery. The felony murder convictions were vacated as a matter of law, and the court merged the aggravated assault conviction with the conviction for malice murder. On December 9, 2003, Hilton filed a motion for new trial, which was amended in March 2009 and denied on June 16, 2009. On September 24, 2009, Hilton filed a motion for out-of-time appeal, and the next day, the trial court granted the motion and Hilton filed a timely notice of appeal. The case was docketed in this Court for the April 2010 term and was later submitted for decision on the briefs.

"taken care of business." Hilton explained that he and Myers had killed a police officer, and Hilton showed Abdur-Razzaq a badge and a .38 caliber revolver that Hilton said he had used to shoot Officer Green. Hilton also told Abdur-Razzaq that he and Myers had patrolled the streets of Atlanta looking for a police officer to kill before they found Officer Green. Abdur-Razzaq added that, after the shooting, everyone in the cell was packing up to leave Atlanta.

Avon White, another BLA member, testified that, in October 1971, Thomas ordered Hilton and Myers to kill a police officer and that, in November, Hilton told White that he had followed Thomas's orders and killed an officer. Hilton was in possession of the officer's gun, which was still in its holster, as well as the officer's badge. White added that someone from the cell took the gun and threw it into a lake. The gun was recovered from that lake.

In 2001, Hilton, who had changed his name to Kamau Sadiki, was arrested in New York City on a weapons charge. When he was questioned, he told the police that he had information about the killing of two New York City police officers in the 1970s. New York officers eventually contacted the Atlanta Police Department about Hilton, and subsequent interviews of White and Abdur-Razzaq led to the indictment of Hilton for Officer Green's murder.

Viewed in the light most favorable to the verdict, the evidence presented at trial and summarized above was sufficient for a rational jury to find the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SC 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) (" 'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.' " (citation omitted)).

2. Hilton contends that the trial court erred in excluding testimony from Ignae Thomas, who was John Thomas's girlfriend in 1971 and later his wife. At a pre-trial hearing, Ms. Thomas testified that, in late November or early December 1971, she, Thomas, and Myers were out crabbing at a river in Tampa, Florida, when a deputy sheriff approached them and made small talk. When the deputy left, Myers said that he was "lucky he got away with his life because I could have done to him what I did in Atlanta." Thomas told Myers to "shut up." Ms. Thomas added that, in 1977, her husband, who had been drinking, vented feelings of guilt about his past misdeeds. One regret was that he allowed people to think that Hilton was guilty of murdering the Atlanta police officer, when in truth he and Myers were the killers. Myers, who was killed by New York City police officers in 1973, and Thomas, who was killed by Ms. Thomas in self-defense in 1978, were unavailable to testify at Hilton's trial. We find no error in the trial court's exclusion of Ms. Thomas's testimony.

Evidence of a co-indictee's alleged confession is generally inadmissible hearsay. However, another person's confession to a third party may be admitted in the guilt-innocence phase under exceptional circumstances that show a considerable guaranty of the hearsay declarant's trustworthiness. The trial court must determine whether the value and reliability of the tendered hearsay evidence outweigh the harm resulting from a violation of the evidentiary rule. In [*Chambers v. Mississippi*, 410 U. S. 284, 300-302 (93 SC 1038, 35 LE2d 297) (1973),] the hearsay testimony was deemed trustworthy and admissible because the declarant (alleged to be the perpetrator by Chambers) made three spontaneous confessions to close friends shortly after the murder, the confessions were against the declarant's interest, each confession was corroborated by other evidence (including eyewitness testimony to the shooting, a sworn confession by the declarant that was admitted at trial, and evidence that the alleged perpetrator had been seen with the murder weapon), and the declarant was present in the courtroom and available for cross-examination.

*Drane v. State*, 271 Ga. 849, 852-853 (523 SE2d 301) (1999) (citations omitted). The trial court's decision to exclude such evidence will not be disturbed on appeal absent an abuse of discretion. See *Coleman v. State*, 286 Ga. 291, 300 (687 SE2d 427) (2009).

Because Myers's alleged statement to Ms. Thomas is consistent with the evidence in this case that he and Hilton acted together in murdering Officer Green, we readily conclude that the trial court did not abuse its discretion in excluding her testimony about that remark, as the value of Myers's statement to the defense was minimal at best and did not outweigh the harm from a violation of the hearsay rule.

We similarly conclude that the trial court did not abuse its discretion in excluding evidence of John Thomas's statement. The statement was made many years after the murder, not spontaneously shortly after the crime occurred; it was not corroborated by any other evidence but instead was inconsistent with other evidence that Thomas ordered the killing of Officer Green but was not personally involved in the actual shooting; and the declarant was deceased and thus not present and available for cross-examination. Moreover, Ms. Thomas testified that BLA members like her husband engaged in "disinformation," disseminating misinformation as to who committed crimes. Under these circumstances, the trial court did not abuse its discretion in excluding the hearsay statements.

3. Hilton contends that the trial court erred in permitting a New York City detective to testify that Hilton said that he had some information on some crimes committed by the BLA, including the killing of several New York City police officers and several bank robberies during the time frame in which the murder of Officer Green occurred. Significantly, however, no evidence was presented of the specific crimes mentioned by Hilton or of any involvement by Hilton in the crimes.

The evidence demonstrated the goals and activities of the BLA, as well as Hilton's insider knowledge thereof, and thus was relevant to show Hilton's motive and intent in this case, as well as to support an inference that he was privy to discussions with Thomas regarding the killing of Officer Green. See *Mize v. State*, 269 Ga. 646, 650 (501 SE2d 219) (1998) (holding that evidence of the defendant's racist beliefs and membership in the Ku Klux Klan and evidence that he possessed racist symbols were admissible to show motive and bent of mind); *Clark v. State*, 271 Ga. 6, 9 (515 SE2d 155) (1999) (holding that evidence that the defendant and the victim were members of a gang and that the victim had been killed for talking to police about a crime that members of the gang had committed was admissible, because the State may present evidence of motive and because relevant evidence does not become inadmissible when it may incidentally put a defendant's character into evidence); *United States v. Gonzalez-Sanchez*, 825 F2d 572, 583 (1st Cir. 1987) (holding that the defendant's knowledge of a gang's criminal activities was admissible as probative of his intent with regard to another crime, particularly because it did not directly implicate him in the gang's crimes but "did no more than show his knowledge of others' conduct"). Accordingly, we find no merit to this enumeration of error.

4. Hilton contends that the trial court erred in its charge on conspiracy.

(a) Hilton acknowledges that, even though he was not indicted for the substantive crime of conspiracy, it is not error to charge on conspiracy if the evidence warrants the charge. See *Guyton v. State*, 281 Ga. 789, 791 (642 SE2d 67) (2007); *Mangum v. State*, 274 Ga. 573, 578 (555 SE2d 451) (2001). Hilton argues, however, that the evidence did not warrant the charge. We disagree. " 'The essence of conspiracy is a common design, and conduct which discloses a common design may give rise to an inference of conspiracy.' " *Freeman v. State*, 273 Ga. 137, 139 (539 SE2d 127) (2000) (citing *Waldrip v. State*, 267 Ga. 739, 747 (482 SE2d 299) (1997)). "A conspiracy may be inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances." *Washington v. State*, 268 Ga. 598, 601 (492 SE2d 197) (1997) (citation and punctuation omitted). Here, the

evidence that Thomas, Myers, and Hilton plotted together to kill a police officer was sufficient to support the charge on conspiracy.

(b) Hilton also complains of the following portion of the conspiracy charge: "[W]hen persons associate themselves in an unlawful enterprise, any act done by any party to the conspiracy to further the unlawful enterprise is to be considered the act of all the conspirators." Hilton contends that, pursuant to this part of the charge, if the jury found that he was a member of the BLA and found that the BLA had unlawful aims, the jury could convict him no matter which member of the BLA actually shot Officer Green.

However, jury charges are not to be evaluated in isolation, but rather must be considered as a whole. See *Salahuddin v. State*, 277 Ga. 561, 564 (592 SE2d 410) (2004). The trial court also charged the jury that:

> A jury is not authorized to find a person who merely associated with other persons involved in the commission of a crime guilty of consent in or concurrence in the commission of the crime unless the evidence shows beyond a reasonable doubt that such other — that such persons helped in the actual perpetration of the crime or participated in the criminal enterprise.
>
> Mere membership alone of [Hilton] in the Black Liberation Army is insufficient to support a guilty verdict.

Considering the charge as a whole, it is not susceptible to the interpretation Hilton places on it. Instead, it properly conveyed to the jury that it could find Hilton guilty based on a conspiracy only if it found beyond a reasonable doubt that he aided in the actual perpetration of the crimes or actually participated in the conspiracy that led to Officer Green's death.

5. Finally, Hilton contends that the delay of more than 30 years between the crimes in November 1971 and the indictment in July 2002 violated his due process rights under the State and Federal Constitutions. To prevail on this claim, Hilton must " 'prove (1) that the delay caused actual prejudice to his defense, and (2) that the delay was the result of deliberate prosecutorial action to give the State a tactical advantage.' " *Bunn v. State*, 284 Ga. 410, 411 (667 SE2d 605) (2008) (quoting *Manley v. State*, 281 Ga. 466, 467 (640 SE2d 9) (2007)). Accord *Stoner v. Graddick*, 751 F2d 1535, 1542-1543 (11th Cir. 1985). After a pre-trial hearing, the trial court found that Hilton failed to prove either prong of the due process test and denied his motion to dismiss the indictment. We see no error in that decision.

Our review of the record shows that the trial court did not err in

ruling that Hilton failed to demonstrate actual prejudice from the delay in his prosecution.

> The offense in this case is murder, for which there is no applicable statute of limitation. Hence, any prejudice which results merely from the passage of time cannot create the requisite prejudice. The possibilities that "memories will dim, witnesses become inaccessible, and evidence be lost" are inherent in any extended delay, and, "these possibilities are not in themselves enough to demonstrate that [the appellant] cannot receive a fair trial."

*Wooten v. State*, 262 Ga. 876, 880 (426 SE2d 852) (1993) (citation omitted).

Hilton also failed to prove that the State engaged in deliberate delay to gain a tactical advantage. In his appellate brief, Hilton does not "allege that the delay was an intentional attempt by the prosecution to gain a tactical advantage," does not present "any arguments to that effect," *Wooten*, 262 Ga. at 880, and does not cite to any portion of the record supporting such an intent. Our review of the record does not show any such intent. Instead, although the prosecutor had some leads in the case in the early 1970s, he did not believe he had sufficient evidence to proceed to an indictment and prevail at trial; there was then an extended period of inaction on the case by the State, but with no evidence showing that this delay was deliberate and designed to gain an advantage.

As the United States Supreme Court has explained:

> It requires no extended argument to establish that prosecutors do not deviate from "fundamental conceptions of justice" when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause. It should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. To impose such a duty "would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself."

*United States v. Lovasco*, 431 U. S. 783, 791 (97 SC 2044, 52 LE2d 752) (1977) (citation omitted). Moreover, the Eleventh Circuit has held that a "government's inaction in bringing the case is insufficient, standing alone, to establish that the government's actions

were motivated by an attempt to gain a tactical advantage." *United States v. Butler*, 792 F2d 1528, 1534 (11th Cir. 1986). Similarly, in *Stoner*, 751 F2d 1535, the State initially declined to prosecute a crime committed in 1958 due to the belief the evidence would not support a prosecution. See id. at 1543. There was then an almost 20-year period of inactivity on the case, for which the State offered no reason but for which no bad faith reason was shown to exist. The Eleventh Circuit held that, "[s]ince controlling precedent makes intent to delay to gain tactical advantage a necessary component of Stoner's due process claim," it was not error to deny relief. Id.

Here, the record shows that the State did not seek Hilton's indictment in the period shortly after the crimes due to its belief that the evidence was insufficient to proceed, and the record contains no showing that the long delay that followed this initial decision was deliberate and designed to give the State a tactical advantage. Accordingly, the trial court did not err in denying Hilton's motion to dismiss based on pre-indictment delay.

*Judgment affirmed. All the Justices concur.*

DECIDED NOVEMBER 8, 2010.

*Stephen R. Scarborough*, for appellant.

*Paul L. Howard, Jr., District Attorney, Bettieanne C. Hart, Peggy R. Katz, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Benjamin H. Pierman, Assistant Attorney General*, for appellee.