S12A0568. CURRY v. THE STATE.
(729 SE2d 370)

HINES, Justice.

Michael Curry ("Curry") appeals his convictions for the malice murders of Ann Curry, Erika Curry, and Ryan Curry.[1] For the reasons that follow, we affirm.

Construed to support the verdicts, the evidence showed that on August 29, 1985, police officers went to the house where Curry lived with his family, in response to a telephone call originating from a neighboring house. Inside the Curry house, the officers found the bodies of Curry's eight-months-pregnant wife, Ann Curry, and those

---

[1] The crimes occurred on August 29, 1985. On May 19, 2009, a Muscogee County grand jury indicted Curry for the malice murder of Ann Curry, the felony murder of Ann Curry while in the commission of aggravated assault, the aggravated assault of Ann Curry, the malice murder of Erika Curry, the felony murder of Erika Curry while in the commission of aggravated assault, the aggravated assault of Erika Curry, the malice murder of Ryan Curry, the felony murder of Ryan Curry while in the commission of aggravated assault, the aggravated assault of Ryan Curry, and two counts of feticide. On November 12, 2009, the trial court entered an order dismissing the counts of aggravated assault and feticide. Curry was tried before a jury April 19-27, 2011, and found guilty of all remaining charges. On July 21, 2011, he was sentenced to three consecutive terms of life in prison for the malice murder counts, and the felony murder counts were vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993). That same day, Curry filed a notice of appeal; his appeal was docketed in this Court for the January 2012 term, and submitted for decision on the briefs.

of their children, four-year-old Erika and 20-month-old Ryan. The bodies of Ann and Ryan were in the den. Ann had lacerations and puncture wounds to the head, neck, and upper torso; she was nearly decapitated, and she had a deep puncture wound to her left temple. Ryan had several lacerations about his head and bruising on his upper torso. Erika's body was in the kitchen, and also had several lacerations to her head and face. Ryan and Erika died of skull fractures, and Ann died of massive blood loss. Ann's unborn child also died. A few weeks earlier, Curry had purchased an axe that he kept in an outside-entry storage room at the rear of the house; it was in the living room, bloodied.

The house showed no signs of having been ransacked or searched; the only thing of value that appeared out of place was a purse overturned in a chair. Next to it was a second purse, which was known to the family not to contain money as it had become a children's plaything; it was unopened. A checkbook, television, and stereo equipment were all undisturbed. Windows and doors of the home were closed. An overturned trash can blocked the kitchen's exterior door, such that it would have been disturbed if someone had tried to enter or exit through that door. In the den, a multi-pane door that allowed access to the rear exterior of the house had a pane of glass that had been broken from the inside; the door was locked by deadbolt and handle lock, and glass situated against the door indicated it had not been opened since the glass was broken. The thermostat inside the house was turned to the highest setting, and the accompanying thermometer registered 90 degrees, beyond which it could not go; the outside temperature that day was in the high 80s.

Curry worked as a supervisor in the physical plant office of a hospital. On the day of the crimes, he told investigating police officers that he left work that morning at 9:40 a.m. to purchase a fan for the hospital. He went first to a Sears store,[2] watched some construction nearby, then went to a Montgomery Ward store. He did not purchase a fan at either store. He finally bought a six-inch oscillating fan at a K-Mart store; the receipt showed that the purchase was made at 12:55 p.m. When he bought the fan, Curry was drenched in sweat, which the cashier found odd as the store was usually cold. Curry returned to work around 1:10-1:15 p.m.[3] After work, Curry went home and found his family dead.

---

[2] It was later learned that Curry knew beforehand that a fan could not be purchased at Sears because the hospital had exhausted its account with that store.

[3] The route Curry stated he drove, coupled with the time he claimed to have spent shopping or walking around, left a significant amount of unaccounted-for time. A vehicle sign-out board,

Curry gave several versions of what happened at the house after he arrived home from work, which he left at 5:15 p.m. He stated that though he ordinarily entered the house through the kitchen door, he came through the front door "this morning" because he saw a flier on the front door; he later said that it was after work that he entered through the front door.[4] At one point, Curry said that he saw Ann's purse, and dumped it out, but did not explain why; at another point, he stated that he came in and sat down. He also stated that he knelt next to Erika's body in the kitchen, but the blood on the floor next to her was undisturbed and lab tests showed no blood on Curry's clothes. Curry further said that when he went to call the police from a neighbor's residence, he left through the side kitchen door. When asked how, given that the trash can blocked it, he stated that, rather, he left through the front door. When asked if anything troubling had recently occurred, Curry mentioned only that Ann had recently received an obscene phone call. Curry did not answer when asked if there were martial problems, but did admit to financial difficulties; he said he had no problems with anyone at work or otherwise in his life that might have led to these crimes.

At a coroner's inquest held several months after the murders, Curry admitted that he had had an affair with co-worker Pam Burt, who also worked at the hospital, and that this relationship began when Ann was in the hospital with pregnancy complications. He also stated that a week before the murders, Pam's husband, Fred Burt, told Curry that he could hurt him without even touching him. Police investigators determined that Fred Burt had an alibi. Curry also testified at the inquest that he could not remember whether he handled Ann's purse after finding the bodies. Curry wrote a letter to a friend of Ann's and told her that Ann had been killed in a burglary. During the inquest, the coroner stated that a time of death could not be pinpointed, but that it appeared to be "in the p.m."

The medical examiner who performed the autopsy died before trial; his conclusion as to the time of death was between 2:30 and 3:00 p.m., August 29, 1985. At trial, a medical examiner opined that there could be no accurate estimate as to time of death because of the high temperature in the house and Ann's pregnancy, factors that could skew body temperature upon which an estimate of the time of death could be based. After examining the records of the autopsy, and recognizing that the temperature of the house was known only to be

---

kept in Curry's office, showed an erased time slot for the vehicle Curry claimed to have been driving; information for other company vehicles remained undisturbed.

[4] The flier was found on the bed in the master bedroom.

in excess of 90 degrees, this medical examiner estimated that Ann died sometime during the morning or afternoon hours of August 29, 1985.

At trial, Bernice Johnson, Ann's mother, testified that Ann and the children came to her house the morning of the murders, and that Ann and Erika left to go shopping. While they were gone, she fed Ryan during a television show that was on from 11:00 a.m. to 12:00 noon. Ann and Erika returned, and the three left ten minutes later. Johnson was not sure of the time they left, although she initially told police officers it was about 12:30 p.m.; she later told police officers it might have been as early as 12:15 p.m. Travel time from Johnson's house to Curry's was seven minutes.[5]

1. Curry asserts that the evidence was insufficient to support his convictions, contending that the State presented only circumstantial evidence that did not exclude all reasonable hypotheses except that of his guilt. See OCGA § 24-4-6.

> [Q]uestions as to the reasonableness of hypotheses are generally to be decided by the jury which heard the evidence and where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of guilt, that finding will not be disturbed unless the verdict of guilty is insupportable as a matter of law. [Cit.]

*Robbins v. State*, 269 Ga. 500, 501 (1) (499 SE2d 323) (1998). The evidence authorized the jury to find Curry guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Curry contends that the delay of almost 24 years between the crimes and his indictment violated his due process rights under the State and Federal Constitutions. To prevail on this claim, Curry must "prove (1) that the delay caused actual prejudice to his defense, and (2) that the delay was the result of deliberate prosecutorial action to give the State a tactical advantage." *Hilton v. State*, 288 Ga. 201, 206 (5) (702 SE2d 188) (2010) (Citations and punctuation omitted.).

> The offense in this case is murder, for which there is no applicable statute of limitation. Hence, any prejudice which results merely from the passage of time cannot create the

---

[5] There was evidence that the travel time from the Curry home to the K-Mart where Curry purchased the fan was 13 minutes.

requisite prejudice. The possibilities that memories will dim, witnesses become inaccessible, and evidence be lost are inherent in any extended delay, and, these possibilities are not in themselves enough to demonstrate that [the appellant] cannot receive a fair trial.

Id. at 207 (Citation and punctuation omitted.).

Curry contends that, beyond the mere passage of time, the State failed to preserve an alleged confession to the crimes given in 1986 by a mental patient who was confined at the time of his statement. No copy of the purported confession could be located, although references to it, and the patient's recantation of it, were available. As the trial court noted, both the patient and a police officer who was involved in the taking of the alleged confession were available to testify; they were not called to do so, either at a hearing or the trial. Although the medical examiner who performed the autopsies had died since the murders, as had the coroner, and receipts from the purchases Ann Curry made before she went to Johnson's house the day of the crimes could not be located, such events are inherent in the passage of time. See *Manley v. State*, 281 Ga. 466, 467-468 (640 SE2d 9) (2007). The trial court did not err in determining that Curry failed to demonstrate "any prejudice which would not be expected due to the passage of time." *Jackson v. State*, 279 Ga. 449, 451 (2) (614 SE2d 781) (2005) (Citations and punctuation omitted.). Further, although Curry contends that the State's delay in seeking an indictment against him was unjustified, he cites no evidence to establish bad faith on the State's part. See *Hilton*, supra at 208. See also *Johnson v. State*, 289 Ga. 106, 109-110 (4) (709 SE2d 768) (2011).

3. Curry contends that the State improperly commented on his right to remain silent in three instances by: eliciting testimony from a police investigator that during an interview with Curry, there were questions to which Curry made no response; eliciting testimony from Johnson, Ann Curry's mother, that Curry did not answer questions she posed to him; and, during closing argument, referring to the testimony of the investigator and Johnson regarding questions that Curry did not answer.

The investigator testified that, during the course of the interview, Curry had no response to questions asking what would cause someone to commit these crimes against his family, how long Curry thought the victims might have been dead when he found them, and whether Curry had gone to the back patio or tool shed with the bush

axe.[6] Curry contends that this violated this Court's precedent prohibiting the State from commenting on a defendant's silence prior to arrest, or his failure to come forward voluntarily. See *Mallory v. State*, 261 Ga. 625, 629-630 (5) (409 SE2d 839) (1991), overruled on other grounds, *Clark v. State*, 271 Ga. 6, 9-10 (5) (515 SE2d 155) (1999). See also *Reynolds v. State*, 285 Ga. 70, 71 (673 SE2d 854) (2009) (*Mallory* sets forth a "bright-line evidentiary rule."); *Moore v. State*, 278 Ga. 397, 399 (2) (a) (603 SE2d 228) (2004) (*Mallory* applies to the State's questioning of a witness.). However, Curry did not object to any of these questions, and thus has not preserved for appellate review any challenge to them. *Martin v. State*, 281 Ga. 778 (2) (642 SE2d 837) (2007). In any event, the investigator's testimony concerned Curry's silence in response to questions *after* Curry had been advised of his *Miranda*[7] rights and had waived his right to remain silent. As Curry did not invoke his right to remain silent during the interview, the testimony regarding Curry's failure to respond to these questions was admissible. *Rogers v. State*, 290 Ga. 401, 404-406 (2) (721 SE2d 864) (2012).

The investigator was also asked why the interview ended, and responded that Curry "was falling asleep [and] not answering questions. . . . And he had already agreed to come back the next day to continue that interview." The State then asked: "And did your office receive a phone call from his attorney the next day?" At this point, Curry's attorney stated: "I'm going to object to this and I'm just about ready to move for a mistrial about his right to remain silent." During a bench conference, the court stated "it's not grounds for a mistrial at this point because no further questions were asked"; Curry made no further objection, and the State's examination continued without pursuing the topic of a telephone call from Curry's attorney. To the extent that the investigator's testimony about why the interview ended reflected Curry's invocation of his right to counsel, or Curry's termination of the interview, there was no reversible error. See *McClarin v. State*, 289 Ga. 180, 182-183 (3) (a) (710 SE2d 120) (2011).

Johnson testified that, after the funeral, she asked Curry whether he had killed his family or knew who did, and that he did not answer. Curry made no objection to Johnson's testimony, or the question that prompted it, and any challenge to it has not been preserved for appellate review. *Martin*, supra. As to comments made during the State's closing argument, before argument, Curry moved that the

---

[6] Curry does not cite the portion of the investigator's testimony in which he reported that Curry had no response to a question asking whether he and Ann had marital problems.

[7] *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

State be precluded from referring to the questions Johnson asked of Curry and that he did not answer.[8] The court denied the motion and, after argument, Curry did not renew his motion or seek any remedial action. Assuming that Curry has preserved for appellate review any asserted error arising from the prosecutor's argument, see *Butler v. State*, 273 Ga. 380 (8) (541 SE2d 653) (2001), counsel has wide latitude in making closing arguments based on the evidence properly before the jury. *Smith v. State*, 284 Ga. 599 (2) (a) (669 SE2d 98) (2008).

4. During its direct examination of Fred Burt, the State asked whether he had fully cooperated with the investigating officer, and Burt replied: "Sure. Took a lie detector test." After a bench conference, the trial court gave the jury a curative instruction and denied Curry's motion for a mistrial. "The grant or denial of a motion for a mistrial lies within the sound discretion of the trial court, which will not be disturbed on appeal unless it was manifestly abused. [Cit.]" *Davis v. State*, 285 Ga. 343, 345 (4) (676 SE2d 215) (2009).

> We find no reversible error in the denial of the motion for mistrial. Witness [Burt] merely communicated to the jury in a spontaneous remark that he took a lie detector test. Since [Burt] did not further apprise the jury of the results of the test, there is no prejudice. [Cits.]

*Durden v. State*, 274 Ga. 868, 870 (5) (561 SE2d 91) (2002). And, the trial court's curative instruction to the jury to disregard the unsolicited statement was sufficient to prevent the testimony from having any prejudicial impact. Id.

5. Grable lived across the street from the Curry home at the time of the 1985 crimes. Curry wished to introduce into evidence that, more than three years later, in 1989, Grable committed crimes in the house in which Curry's family was killed by covering his head, knocking on the door when no adult male was present, and forcing a fifteen-year-old girl at gunpoint to perform sexual acts. Curry also wished to show that in 1999, in another county, Grable went to a home when only a young female was present, and, upon being told that her father, whom he knew, was not present, attacked her with his fists and attempted to rape her.

> A defendant is entitled to introduce relevant and admissible evidence implicating another person in the commission of

---

[8] Curry made no such motion regarding the investigator's testimony.

the crime or crimes for which the defendant is being tried. However, the proffered evidence must raise a reasonable inference of the defendant's innocence, and must directly connect the other person with the corpus delicti, or show that the other person has recently committed a crime of the same or similar nature.

*Mutazz v. State*, 290 Ga. 389, 391 (2) (722 SE2d 47) (2012) (Citations and punctuation omitted.). Evidence that merely casts a bare suspicion on another or "raise[s] a conjectural inference as to the commission of the crime by another, is not admissible. [Cits.]" *Azizi v. State*, 270 Ga. 709, 714 (6) (512 SE2d 622) (1999) (Punctuation omitted.). Grable's crimes were not similar to those for which Curry was tried; among other dissimilarities, no evidence suggested that Curry's victims were the targets of any sexual attack. See id. Nor did Grable's crimes directly connect him to the corpus delicti, and at most cast a bare suspicion upon him. See *Livingston v. State*, 271 Ga. 714, 721 (7) (524 SE2d 222) (1999); *Azizi*, supra; *Klinect v. State*, 269 Ga. 570, 573 (3) (501 SE2d 810) (1998).

6. During deliberations, the jury requested to be recharged on reasonable doubt and circumstantial evidence. The court repeated its pattern instructions on direct and circumstantial evidence, and the requirement that to warrant a conviction on circumstantial evidence, every other reasonable theory save that of the guilt of the accused must be excluded. The court also gave an illustrative example saying:

If you look out the window and you see it raining, that's direct evidence of the fact that it's raining, that's direct evidence of the fact that it's raining outside. You see rain falling. Thunder and lightning. If you are inside a building and a guy comes in with an umbrella and he's shaking water off of it and he's tracking all over the floor, although you can't see outside, you can kind of assume that it's raining outside. That's circumstantial evidence that it may be raining outside.

Do you follow? You can infer that it's raining outside because the person came in the building from the outside and they were wet and they had an umbrella and they had a raincoat and their feet were wet. It's an inference that it's raining outside.

. . .

> The fact that he's wet is direct evidence. The fact that he has an umbrella is direct evidence. The fact that his feet are wet is direct evidence. But it's circumstantial proof of the fact that it's raining outside. All right?

The court recessed, and the jury returned to its deliberations. After a period of time, the jury again communicated with the court regarding the status of the deliberations, and the court sent the jury home for the night. The next morning, the court sent the jury out to resume its deliberations. Curry then raised an objection to the court's use of the term "assume" in its recharge, and requested an additional recharge, which the court denied.

Under OCGA § 17-8-58 (a),[9] a party who objects to any portion of the jury charge must lodge a specific objection to it before the jury retires to deliberate. Curry's objection was made after the jury resumed its deliberations, and thus was untimely. Moreover, there was no "plain error" under OCGA § 17-8-58 (b). See *State v. Kelly*, 290 Ga. 29, 32-33 (2) (a) (718 SE2d 232) (2011). This Court has accepted as a succinct statement of the test for plain error under the Code section that "the proper inquiry is whether the instruction was erroneous, whether it was obviously so, and whether it likely affected the outcome of the proceeding." *Guajardo v. State*, 290 Ga. 172, 176 (4) (718 SE2d 292) (2011) (Citations and punctuation omitted.). And, "[j]ury instructions must be read and considered as a whole when determining whether the charges contained error. [Cit.]" Id.

Here, the trial court's recharge and illustrative example specifically instructed the jurors that an inference could be drawn from circumstantial evidence, and even the use of the word "assume" was qualified; in the court's illustration, it stated that "you can *kind of* assume that it's raining outside." The recharge cannot be read as confusing on the subject of what constitutes circumstantial evidence.

---

[9] OCGA § 17-8-58 reads:

(a) Any party who objects to any portion of the charge to the jury or the failure to charge the jury shall inform the court of the specific objection and the grounds for such objection before the jury retires to deliberate. Such objections shall be done outside of the jury's hearing and presence.

(b) Failure to object in accordance with subsection (a) of this Code section shall preclude appellate review of such portion of the jury charge, unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties. Such plain error may be considered on appeal even if it was not brought to the court's attention as provided in subsection (a) of this Code section.

Taken as a whole, the trial court's recharge to the jury was not obviously erroneous, and plain error cannot be shown. *Guajardo,* supra.

*Judgments affirmed. All the Justices concur.*

DECIDED JULY 9, 2012 —
RECONSIDERATION DENIED JULY 26, 2012.

*Robert L. Wadkins, Stephen A. Craft, Victoria L. Novak, Robin H. King,* for appellant.

*Julia Fessenden Slater, District Attorney, William D. Hocutt IV, Assistant District Attorney, Samuel S. Olens, Attorney General, Paula K. Smith, Senior Assistant Attorney General, David A. Zisook, Assistant Attorney General,* for appellee.