**SECOND DIVISION**
**BARNES, P. J.,**
**MILLER, and RAY, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**October 4, 2013**

# In the Court of Appeals of Georgia

A13A0943. CARTER v. THE STATE.

BARNES, Presiding Judge.

A jury convicted Candace Renee Carter of robbery, and she appeals, contending that insufficient evidence corroborated the accomplice testimony presented at trial. She also contends that her trial counsel was ineffective for several reasons. For the reasons that follow, we affirm.

1. Carter contends that the testimony of her accomplice was uncorroborated and thus insufficient to support her conviction. In Carter's view, the evidence created only a "grave suspicion" of guilt. We disagree.

An appellate court reviews the evidence in a criminal case in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Robinson v.*

*State*, 314 Ga. App. 545, 546 (724 SE2d 846) (2012). See also *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

So viewed, the evidence showed that Carter drove her friends Abrianne Suggs and Sharee Harris to a Family Dollar store one evening. Carter waited in the car while Suggs and Harris went inside, where Suggs texted Carter to let her know how many people were in the store. Harris then robbed the employees at gunpoint and got into Carter's car. Carter drove home, leaving Suggs inside the store. A few minutes after Carter and Harris returned to Carter's house, Suggs left the store and walked to a nearby Waffle House. She called Carter, who picked her up in a different car and the two women returned to Carter's house. Harris gave some of the robbery money to Carter and some to Suggs.

Based on information from a tipster, the lead detective found and downloaded pictures of all three women from Facebook. The investigator reviewed a store video of the robbery and tentatively identified Harris as the person with the gun. The two store employees, who testified at Carter's trial, then identified Harris as the gunwoman from a photographic lineup, The detective tracked down Suggs and during an interview in his car, Suggs first admitted being in the store when it was robbed and then admitted having caught "a glimpse" of the robber's face. When the detective

2

showed Suggs the photographic lineup, she acknowledged that she knew Harris and that she had Harris's phone number and directions to her house in her cell phone.

The detective asked Suggs what she was doing in the area of the robbery since she did not live nearby, and Suggs said that she had been visiting Carter, who gave her a ride to the store to buy some dog food and that Harris rode with them to the store. Suggs said Carter left and then picked her up a few minutes later at a Waffle House. She agreed to show the detective where Carter's apartment was located and then offered to call her to see if she would meet with him. The detective suggested she tell Carter that police had interviewed her and see how Carter would react.

Suggs called Carter on her cell phone and the detective listened to the first part of the call through the phone's speaker. Suggs told Carter that the police knew everything, but Carter did not believe her, stating that if the police knew everything, Suggs would be on her way to jail because it had been a "plot" Suggs had set up. Suggs took the phone off speaker but the detective still overheard Carter talk about text messages related to the number of employees in the store and Harris leaving fingerprints. Suggs eventually told Carter that she was making the call from a police car, and when Carter did not believe her, the detective took the phone and told Carter he would like to talk to her about an incident at the particular store. Carter told him

3

to come by her apartment and he drove the quarter-mile there and recorded their conversation. Carter told the detective that she had given Suggs a ride to the store, dropped her off, received a text message about the number of employees in the store, returned to pick up Suggs in the same car, and no one else had been in the car with them.

Harris was subsequently arrested when she admitted robbing the store during the execution of a search warrant at the house where she lived with her parents. She showed the detective the clothes she had been wearing, which matched the clothes worn by the robber in the store video, and said she left the gun, which was a BB gun belonging to one of Suggs' friends, in Carter's car. She admitted to her mother that she had spent the money and implicated Suggs, but would not talk about Carter.

Carter agreed to a second interview at the police station, where the detective advised her of her *Miranda* rights after telling her she was a suspect in the robbery. This time, Carter admitted that Harris had also ridden to the store with her, that Harris and Suggs went inside, that Harris came out alone and the two of them left, and that she returned to pick up Suggs in a different car because the other vehicle was out of gas.

Both Suggs and Carter changed their stories a number of times during the course of the investigation. When questioned, Harris admitted that she had robbed the store, and Suggs admitted to being inside as the lookout. Both Suggs and Harris testified that Carter participated in the robbery as the driver and Harris testified that Carter received some of the stolen money. Harris also testified that Carter had recently asked her if she "would ever rob for her." Carter admitted to driving her friends to and from the store, but she denied knowing about the robbery.

All three women were indicted for armed robbery. Suggs and Harris entered guilty pleas for the lesser included offense of robbery, and Carter proceeded with a jury trial.

Carter contends that the evidence against her was insufficient because it consisted solely of the uncorroborated testimony of Harris, an accomplice. Generally, the testimony of a single witness is sufficient to establish a fact, but in felony cases where the only witness is an accomplice, the accomplice's testimony standing alone is insufficient. Former OCGA § 24-4-8, repealed and reinstated as OCGA § 24-14-8 (2013). However, "corroborating circumstances may dispense with the necessity for the testimony of a second witness." Former OCGA § 24-4-8. The corroborating evidence must be independent of the accomplice's testimony and must connect the

5

defendant to the crime, but it need not be sufficient by itself to warrant a conviction. *Etchison v. State*, 266 Ga. App. 528, 528-529 (1) (597 SE2d 583) (2004). The testimony of an additional accomplice may constitute corroboration of the first accomplice's testimony, and whether that evidence sufficiently corroborated the first accomplice's testimony was an issue for the jury. *Williams v. State*, 280 Ga. 584, 586 (1) (630 SE2d 370) (2006).

Here, both co-defendants testified that Carter drove them to the store, waited outside while they both went in, left Suggs behind and drove away with Harris, and then returned to pick up Suggs in a different car a few minutes later. Suggs testified that she texted Carter to tell her how many people were in the store, and Harris testified that she gave some of the robbery money to Carter. Both testified that Carter participated in the robbery in her capacity as the driver. Suggs' testimony corroborates that of Harris and vice versa. See *Hillman v. State*, 396 Ga. 310, 312-313 (1) (674 SE2d 370) (2009); *Crowe v. State*, 83 Ga. App. 325, 329 (63 SE2d 682) (1951). Furthermore, the detective testified about the conversation he overheard between Suggs and Carter regarding text messages about fingerprints and the number of employees in the store. And while Carter denied participating in the robbery, whether she did so was simply a question of fact for the jury to decide.

6

The credibility of the testimony of witnesses is for the jury, and all conflicts in the evidence are resolved in favor of the verdict. While there might be discrepancies as to many of the details of the crime, as to the core issue -- was the defendant a participant? -- there was no such conflict in the testimony of the accomplices so as to demand a finding for [Carter] or to require the grant of a new trial.

(Citations and punctuation omitted.) *Crawford v. State*, 210 Ga. App. 36, 39 (2) (435 SE2d 64) (1993). The corroborating evidence in this case was more than slight and was sufficient to authorize the jury to find that Suggs' testimony was corroborated.

2. Carter maintains that she received ineffective assistance of counsel in three related errors. She contends that counsel should have objected to the investigating officer's testimony repeating the anonymous tipster's statements, to the prosecutor's questioning that elicited testimony about Carter's pre-arrest silence, and to the prosecutor's closing argument emphasizing Carter's pre-arrest silence. To prevail on a claim of ineffective assistance of counsel,

appellant must show that her attorney's performance was deficient and that, but for such deficiency, there is a reasonable probability that the outcome of her trial would have been different. In applying this test, we accept the trial court's findings of fact and credibility determinations unless they are clearly erroneous, but we independently apply the proper legal principles to the facts.

(Citation omitted) *Waits v. State*, 282 Ga. 1, 5 (4) (644 SE2d 127) (2007). To establish that the deficient performance prejudiced the defendant "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland v. Washington*, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984).

a. Carter complains that trial counsel failed to object to hearsay testimony from the investigating officer when he repeated the anonymous tipster's out-of-court statements during his testimony. At the hearing on Carter's motion for a new trial, Carter's trial counsel testified that he had no strategic reason for not objecting to the testimony but simply missed the opportunity to make it. Under former OCGA § 24-3-2, "facts to explain conduct and ascertain motives, . . . shall be admitted in evidence not as hearsay but as original evidence."[1] But "police conduct is not a

---

[1] Carter was tried in 2012, when the former Evidence Code applied. As of January 1, 2013 the old code stood repealed and the new Evidence Code became applicable to trials, motions, and hearings conducted after that date. See Ga. Laws 2011, Act 52, § 101.We offer no opinion regarding the hearsay provisions in the new Code, which are found in Chapter 8 of Title 24.

relevant issue . . . where a confidential informant has provided information which initiates an investigation." (Citation and punctuation omitted.) *Brown v. State*, 274 Ga. 31, 37 (2) (549 SE2d 107) (2001).

> [H]earsay testimony explaining an investigating officer's conduct is rarely admissible because the officer's reason for initiating or continuing an investigation is not generally a relevant inquiry at trial. In contrast, the motive and conduct of the witness who first links a suspect directly to the crime often are relevant.

*Pruitt v. State*, 274 Ga. 708, 711 (2) (b) (559 SE2d 470) (2002).

Carter asserts that trial counsel's performance was deficient because he should have objected to the anonymous caller's statements to the investigating officer as inadmissible hearsay in violation of the Sixth Amendment Confrontation Clause, which subjected her to a trial "based on rumor, gossip[,] and speculation." She claims prejudice because this testimony was not cumulative of other admissible evidence.

The State concedes that the hearsay evidence about the anonymous tipster was not necessary to explain the officer's conduct and that trial counsel's failure to object to it "was likely deficient," but argues that Carter was not prejudiced by the statement because it merely established why and how the officer began investigating Harris and Suggs. It points to direct evidence from both Harris and Suggs that Carter was

9

involved in the robbery and to Carter's own admission that she was present when the robbery occurred.

Carter responds that the anonymous tipster's statement that Carter participated in the robbery was the only evidence other than Harris's testimony that implicated her, and thus it is highly probable that the detective's testimony contributed to the verdict. But as discussed in Division 1, the jury would have been authorize to conclude that Harris's testimony was corroborated in several respects unrelated to the tipster. Suggs testified that Carter drove her and Harris to the store, received text messages suggestive of a crime, left with only Harris after the robbery, and retrieved Suggs from a different location in a different car a few minutes later. The detective also testified that Carter admitted these facts to him. If the detective had simply testified that his investigation led him to question Suggs, Harris, and Carter, the incriminating evidence he gathered from them would have been the same.

"Assuming that . . . an objection would have been sustained, in light of the other testimony produced at trial, it is highly probable that the testimony that the investigating officer [decided to question Harris and Suggs] in response to an anonymous tip did not contribute to the jury's verdict." *Felton v. State*, 283 Ga. 242, 246 (2) (d) (657 SE2d 850) (2008).

10

b. Carter contends her trial counsel was ineffective for failing to object to questions from the State which elicited testimony from Carter and the detective about Carter's pre-arrest silence. The following exchange took place between the State and the detective:

Q: Did the defendant mention – well, she admitted to driving Abrianne to the Family Dollar, correct?

A: Correct.

Q: Did she mention anybody else in the car at that point?

A: No, because I specifically asked her who else was in the car with her. She said just me and Abrianne, never mentioned another person in the car.

Q: Did she ever change her story?

A: The next time I interviewed her, which was a few days down the road, her story did change about which car she took to the Family Dollar; also who was in the car with her, that also changed.

. . .

Q: Did you ask her why she had not mentioned Sharee Harris in your first conversation?

11

A: Yes, I did. She said because you never brought up her name, so I didn't mention, I didn't bring up her name.

Carter argues that the State also improperly questioned her about her pre-arrest silence by asking her why she did not initially tell the detective that her son had been in the car with her on the night of the robbery, with no objection from her trial counsel. Carter testified on direct examination that she did not tell the detective during the first interview that Harris and her son had been in the car with her the night of the robbery because he had not asked her if they had been there; he only asked about herself. When he asked her in the second interview to tell him about everyone in the car, then she told him about Harris and her son.

During cross-examination, the State asked Carter if she had mentioned to the detective that the prosecutor or Juror Number 11 was in the car, and when she said no, the State asked,

Q: Why? Because the officer didn't ask you about those people?

A: Correct.

Q: So when somebody asks you who you were with, you're only going to answer whoever they ask you?

A: Corrrect, considering the situation, yes.

Q: So the question who all was with you does not imply, well, maybe he's asking everybody who was in the car? Did that occur to you?

A: No. Like I said, considering the situation, I just –

Q: So when he asked you who was in the car, you said me and Abrianne; right?

A: Yes.

Q: And we know now that Sharee was also in the car; right?

A: Correct.

Q: You did not tell the officer that the first time?

A: Correct.

Q: And you claim now that your son was in the car; correct?

A: Correct. He was.

Q: And you did not tell the officer that either; correct?

A: Correct.

13

The State also questioned Carter about not telling the officer at first about receiving a text message from Suggs about Harris leaving fingerprints at the scene, "just like [she] didn't think of mentioning that Sharee Harris was in the car" or mention that her son was in the car.

After the defense rested, the State recalled the detective and played an audio recording of Carter's first interview, during which Carter said she dropped off Suggs at the Waffle House and picked her from there in her sister's Impala, never mentioning the Family Dollar store until the second interview. Carter returned to the witness stand for surrebuttal and explained that her stories were inconsistent because she had not realized at first that the detective was asking her about the night of the robbery. On cross, after questioning her about her confusion over which night the detective was asking about, the State asked Carter,

Q: At what point during that [first] interview did you tell him Sharee [Harris] was in the car?

A: I didn't.

Q: At what point in that interview did you tell him your son was in the car?

A: I didn't, because I didn't know what day it was.

14

Q: I seem to recall hearing on there [in the recording of the first interview] you making the statement, "I want to give you as much info as possible." Do you remember making that statement?

A: I sure did.

Q: Is it fair to say you did nothing of the sort?

A: Of course, because I had no idea of what was going on.

Carter's trial counsel testified at the motion for new trial hearing that he was not pursuing a trial strategy by failing to object to these questions, but simply had not recognized them as impermissible comments on Carter's right to remain silent. Carter claims that her trial counsel's failure to object constituted ineffective assistance because the prosecutor's questions were aimed directly at the heart of her defense – lack of knowledge – and that the detective's testimony regarding her silence created an inference that her failure to tell the officer that her son and Harris were in the car was an admission of guilt. The State responds that Carter was "anything but silent," "willingly answered the investigator's questions," and simply gave "inconsistent answers and conflicting versions of events."

Former OCGA § 24-3-36 of the old Evidence Code provided that "[a]cquiescence or silence, when the circumstances require an answer, a denial, or other conduct, may amount to an admission."[2] In *Mallory v. State*, 261 Ga. 625, 630 (5) (409 SE2d 839) (1991), overruled on other grounds sub nom. *Chapel v. State*, 270 Ga. 151, 155 (4) (510 SE2d 802) (1998), our Supreme Court held that "a comment upon a defendant's silence or failure to come forward . . . will not be allowed even where the defendant has not received *Miranda* warnings and where he takes the stand in his own defense." In recent opinions, the Georgia Supreme Court noted that former OCGA § 24-3-36 was repealed by the new Evidence Code, but the Court specifically did not rule on *Mallory*'s continued viability under the new code because that issue was not squarely before the Court. See *Romer v. State*, ___ Ga. ___ (745 SE2d 637, 641 (2), n. 4) (2013); *Yancey v. State*, 292 Ga. 812, 817 (2), n. 9 (740 SE2d 628) (2013).

However, this case is not squarely governed by the principle in *Mallory* prohibiting mention of a defendant's silence or failure to come forward. Carter was not silent and did not fail to come forward. She willingly talked to the detective when

---

[2]Former OCGA § 24-3-36 was also repealed by legislation enacting the new Evidence Code. The new code redefines admissions in OCGA § 24-8-801 (d) (2).

16

he drove to her apartment, she voluntarily came to the police station and answered further questions after being advised of her right to remain silent, and she never invoked her right to remain silent. Thus, "the *Mallory* principle did not require the exclusion of testimony about [Carter's] failure" to mention during the first interview that Harris was in the car or to mention during either interview that her son was in the car. See *Yancey*, 292 Ga. at 817 (2) (permissible to ask defendant who voluntarily came to police station and made statement why he would not draw a diagram of crime scene upon request of investigating officers); *Curry v. State*, 291 Ga. 446, 451 (3) (729 SE2d 370) (2012) (permissible to ask defendant who did not invoke right to remain silent why he failed to respond to particular questions during interview); *McMichen v. State*, 265 Ga. 598, 606 (11) (a) (458 SE2d 833) (1995) (questions about why defendant did not mention self-defense claim during voluntary statement were proper inquiries into the inconsistency between voluntary statements and testimony at trial).

"[S]ince appellant spoke with police without ever invoking [her] right to remain silent, the prosecutor's line of questioning did not constitute impermissible commentary on appellant's right to remain silent." *Gilyard v. State*, 288 Ga. 800, 802 (2) (708 SE2d 329) (2011). Accordingly, even a timely objection to the testimony

17

about which Carter complains would have been overruled, and trial counsel was not ineffective for failing to make such an objection. As a matter of law, a failure to interpose a meritless objection does not amount to unreasonable performance. *Bradley v. State*, 292 Ga. 607, 614 (5) (740 SE2d 100) (2013).

c. Finally, Carter contends her trial counsel was ineffective for failing to object when the State argued in closing that Carter's explanation for not telling the detective that Harris was in the car the night of the robbery because she was confused about the dates and other omissions was not credible. "In any event, because evidence about the failure to [disclose these facts to the detective] was [properly] admitted, it was not improper for the prosecuting attorney to reference that evidence in closing." *Yancey*, 292 Ga. at 818 (3). "[A] lawyer has wide latitude in closing argument to remark upon the evidence that has been adduced at trial, and he may draw reasonable inferences or deductions from the evidence." Id. (Citations and punctuation omitted.) The State's argument was a fair commentary upon the evidence introduced at trial, and if Carter's trial counsel had objected, the trial court in its discretion could have overruled it. There being no merit to such an objection, again, Carter's trial counsel was not ineffective for failing to make it. *Bradley*, 292 Ga. at 614 (5).

*Judgment affirmed. Miller and Ray, JJ., concur.*

18